# REPORTS OF CASES

## DETERMINED IN

# THE SUPREME COURT,

## APRIL TERM, 1863.

---

## HEIRS OF NIETO *v.* CARPENTER.

ALTHOUGH a previous ruling of the Appellate Court upon a point directly made is, as to all subsequent proceedings, a final adjudication, yet when the ruling relates to a matter of fact it can only be invoked where the fact reappears under the same circumstances in which it was originally presented.

Thus where, on a previous appeal, a document in the Spanish language was construed and its legal effect declared, the decision being based upon an erroneous translation of the instrument, and on a second appeal a different and correct translation was presented: *Held,* that the Appellate Court was not bound by the former decision, so far as it was induced by the inaccuracy of the translation.

Presumptions are only indulged to supply the absence of facts. There can be no presumption against ascertained and established facts. The presumption, therefore, of a grant from the long possession of land is repelled and destroyed by the production or proof of the instrument under which the possession was held.

To establish a prescriptive title under the Spanish law or to constitute a foundation for adverse possession at the common law, the instrument under which the occupant entered and claims the premises must purport in its terms to transfer the title—must be such as would in fact pass the title, had it been executed by the true owner in proper form (with the exception perhaps of a contract to convey after payment of the consideration) and the occupant must

Nieto *v.* Carpenter.

have entered under it in good faith, in the belief that he had a good right to the premises, and with the intention to hold them against the whole world.

A petition presented to a Mexican Governor for the purpose of obtaining a grant of land is no part of the grant. It is only the declaration of the party who made it, or of the party by whose authority it was made, and is open to explanation.

The grant is the operative instrument, and the representations made to the Governor cannot control the course or nature of the title. If those representations were in truth erroneous, and the mistake in them affected the grant in any respect, the fact could only be made available by the Government.

A Mexican Governor, in 1843, had authority to remove the restraint upon alienation contained in a condition annexed to a grant of land made by a previous Governor, in 1834.

Nieto, under a permission from the Spanish Government, in 1784, to graze his cattle on a tract of land in Los Angeles, took possession of said tract and occupied it until his death in 1804; subsequent to which, his four sons continued the occupation under the same permission, but claimed to be the owners of the premises. In 1832, two of the sons died, both of them leaving widows and one of them five children, surviving. In 1833, the two sons and the widows verbally agreed upon a partition of the premises, and to apply to the Governor of the Department for separate grants to them for the portions received by them respectively on their partition. A partition was accordingly made, and a petition was presented to the Governor representing that in 1784 Gov. Fages had granted the premises to their ancestor, Nieto, and given him the possession thereof, but that the title papers had been misplaced, and asking that separate titles be awarded to them for the several portions received by them on their partition. Upon the petition a decree was made by the Governor, July 27th, 1833, declaring that the parties were owners in fee of the premises and designating the portion falling to each, and directing that juridical possession be given to them. Afterwards, December 21st, 1833, a further decree was made by the Governor directing the execution of the titles, and delivery of juridical possession, and in 1834 the several grants solicited were issued. In the grant to *Josefa Cota*, the widow having the five children, was a recital that she had shown herself entitled to the estate of the deceased Nieto, and the form of the granting clause was a declaration to her of the ownership of the land. Her grant contained the usual conditions annexed to grants in colonization. In 1843, the Governor having released the condition against alienation, she conveyed the land to the defendant. The plaintiffs are the children of Josefa Cota and her husband the son of Nieto, and seek to recover the land upon the ground that a title vested in them on the death of their father as his heirs, which their mother Josefa had no authority to convey. It was shown upon the trial that Nieto never had any title from the Spanish Government, but only a written permission to graze cattle upon the tract of which he took possession: *Held*, 1st, that the presumption of title from the long possession of Nieto and his children was repelled and destroyed by the instrument under which such possession was had; 2d, that by the possession under the written permission no title was acquired by prescription; 3d, that neither by the averments in the petition, nor by any of the recitals in

Nieto v. Carpenter.

the decrees of the Governor, or in the grant to Josefa was she or the defendant estopped from denying that Nieto and his children had any title to the land; and 4th, that the title remained in the Mexican Government until the decree of concession made by the Governor in 1833, which was followed by the grants of the separate parcels in 1834; and that therefore the plaintiffs had no title, and could not recover.

APPEAL from the First Judicial District.

This was an action of ejectment to recover the possession of a tract of land situated in the county of Los Angeles known by the name of "Santa Gertrudis." The case was before this Court at the April term of 1857, and is reported in 7 Cal. 527. The judgment in the lower Court was for the defendant; this Court reversed the judgment and remanded the cause for a new trial. On the second trial, judgment was recovered by the plaintiffs, and on appeal of the defendant the case was again before the Court at the July Term, 1858. By the decision then rendered the judgment of the Court below was reversed and that Court directed to enter judgment for the defendant. The following opinion was at the time filed by BURNETT, J.—FIELD, J. concurring specially in the judgment, but not in the opinion:

"The main facts of this case are stated in the report found in 7 Cal. 527. The case was retried in the District Court, where the plaintiffs had judgment, and the defendant appealed.

"The only question now to be determined is whether the sale, as made by Josefa Cota to the defendant, was authorized by order of Governor Micheltorena.

"That the Governor issued an official document, directed to A. F. Coronel, then Alcalde at Los Angeles, and invested with the powers of Judge of the Court of First Instance, and ex officio Notary Public, is certain; and that this document directed this officer to authorize Josefa Cota to sell the land is equally clear. But this official order itself having been lost, and no copy preserved, its contents could only be shown by parol testimony. It is proven conclusively that Coronel acted only in the capacity of Notary Public, and that he did no act as Judge of the Court of First Instance.

"We must presume that Governor Micheltorena had before him the title papers, otherwise he could have had no competent evidence

that Josefa Cota had any interest in the land, or that the heirs of her deceased husband had any title to it. From an inspection of the title papers, he would see that Josefa Cota held the land under the grant, as the widow of her deceased husband, and as the natural guardian of the children. The grant was made to her in this capacity. A grant of a similar character may be found in the case of *Arguello* v. *The United States* (18 How. 542). In that case, the Governor, in his decree of twenty-sixth of November, 1835, declared the ownership to be in the minor heirs of the deceased; and in the grant of the next day he declares José Estrada to be the owner, after having *first* stated that he had petitioned in the name of his wards. So, in this case, the heirs of Nieto were first declared, by Governor Figueroa, to be the owners of the property in fee simple, and then states that Josefa Cota was the widow of one of these heirs; and when the grant was afterwards issued, it was issued to Josefa Cota, widow of Don Antonio Maria Nieto.

" We think it clear that the order of Micheltorena was intended to direct a sale of the entire interest of all the parties claiming under the grant. The reasons stated in the order, as given by one of the witnesses, show this. In fact, we can see no reason for any sale of less than the full title. Under the circumstances then existing, the Governor could not have intended anything less than a sale of the full property. We must presume, also, that Governor Micheltorena knew the full effect of the title papers, and of the order given by him. We must also presume that the officer to whom the order was directed did his duty in carrying it out. As Governor Figueroa had the right to bind the heirs of Manuel Nieto, in making the partition between them in 1833, so Micheltorena had the power to bind the heirs of Antonio Maria Nieto, by directing a sale of their property in 1843. And there was just as much reason for Micheltorena to decree the sale as for Figueroa to decree a partition. In both cases the acts were direct and simple, and accomplished the end intended in the most expeditious manner. As it was necessary, in *any* view of the matter, to procure the order of the Governor, it was most natural and proper that he should at once grant a full power of sale, without requiring the widow to incur the expense and delay of regular judicial proceedings. All the facts and cir-

cumstances of the case satisfy us that the only thing left for Coronel to do was the act of a Notary in properly executing the instrument of sale.

" Our conclusion is, that the sale made by Josefa Cota to the defendant was just and fair, under the then existing circumstances; that it was authorized by the order of Governor Micheltorena, and should not now be disturbed.

" Judgment reversed, and the Court below will render judgment for defendant."

A rehearing was subsequently granted, and the case was reargued at the October Term of 1859, when the previous decision of the Court on the second appeal was affirmed.   The defendant having in the mean time died, the Court directed its judgment to be entered as of the July Term, 1858, *nunc pro tunc*.   No opinion was rendered on the reaffirmance of the previous decision, but the Justices stated at the time that so soon as the pressure of other business would permit they would prepare and file one in the case.   In pursuance of this statement an opinion was filed at the present term. By stipulation between the parties, the record on the first appeal, and the record on the present appeal, can both be referred to and treated as constituting but one record, and as filed on the present appeal.

*Brent, Saunders,* and *Heydenfeldt,* for Plaintiffs and Respondents.

I.   The decision of the Court in this case, on the first appeal, has settled the question whether or not Manuel Nieto, the ancestor of the plaintiffs, had received from the Spanish Government a grant of a tract of land embracing the premises in controversy.   That he had such a grant, and a perfect title by virtue of it, must be taken, in the further consideration of the case, as established facts. (7 Cal. 527; *Dewey* v. *Gray,* 2 Id. 374; *Clary* v. *Hoagland,* 6 Id. 687; *Washington Bridge Co.* v. *Stewart,* 3 How. 424; *The Santa Maria,* 10 Wheat. 442; *Simple* v. *Anderson,* 4 Gilm. 546; *Meredith* v. *Naish,* 4 Stew. & Port. 59; *Stiver* v. *Stiver,* 3 Ohio, 19; *Spafford* v. *Bradley,* 20 Id. 79; *Hobson* v. *Doe,* 4 Black. 489; *Hossack's Executors* v. *Rodgers,* 25 Wend. 313.)

II. The claim of ownership of the original tract of land possessed by Manuel Nieto, made by his children, and accompanied in 1832, the time of the death of the father of the plaintiffs, by an uninterrupted, notorious, and respected possession, according to metes and bounds, for a term of forty-eight years, is sufficient to maintain ejectment for the whole tract of land, even though the claim of ownership may have been founded on a bare permission to graze cattle, or upon any other defective or even void instrument of writing.

There are many decisions illustrating this doctrine, but none so rich and copious as the case of *La Frombois* v. *Jackson* (8 Cow. 590). Six members of the Court delivered opinions, elaborately discussing the doctrine now in question, and announcing a unanimous judgment of the Court.

La Frombois claimed against the lessee of Smith *et al.* a tract of land, and relied upon adverse possession under color of title. Upon the trial, the document under which he claimed title was produced, and it certainly was more defective than even the written permission to graze cattle mentioned in the special finding in this cause. " It is not necessary," said Chancellor Jones, " to constitute an adverse possession, that it should have commenced under an effectual deed. If the possessor claims under written evidence of title, and on producing that evidence it proves defective, the character of his possession as adverse is not affected by the defects of his title. If the entry is under color of title, the possession will be adverse, however groundless the supposed title may be." The whole case is referred to as, in every line, embracing principles directly analogous to the one under consideration, and as establishing beyond controversy that the possession of the children of Manuel Nieto, accompanied by a claim of title, even though that title be ever so defective, established an adverse possession to all the world, and in the year 1834 had ripened into so robust a right as to have enabled the parties then to have maintained ejectment against all the world, which right has never been lost by the appellants owing to infancy.

In Louisiana, in *Bernard* v. *Shaw et al.* (9 Martin, 49) the Courts have gone further, deciding that claim of title is sufficient

to color the possession, even though it was based upon a deed absolutely void; and this decision establishes the identity of the doctrine of adverse possession in the civil and common law.   And so in Maryland, *Getting's Lessee* v. *Hall* (1 Har. & John. 14–18).

The Court should have presumed a grant to Manuel Nieto or his children.   The doctrine of presuming a grant does not depend upon the Court being satisfied of the fact that such a grant was once made ; on the contrary, the presumption is indulged in for the purpose of protecting an ancient possession, when the Court is even satisfied that no such grant was ever in fact made.

In the case of *Eldridge* v. *Knott* (Cowper, 215) Lord Mansfield said : " Lord Coke says somewhere that an Act of Parliament may be presumed ; and of late it has been held that, even in the case of the crown, which is not bound by the statutes, a grant may be presumed from great length of possession.   It was so done in the case of the corporation of Hull and Horner ; not that, in such cases, the Court really thinks such a grant has been made, because it is not probable a grant should have existed without its being on record, but they presume the fact for the purpose, and from a principle of quieting the possession."

But a much stronger case of presumption than is needed in the case at bar is presented by *Goodlittle* v. *Baldwin* (11 East. 488). This was a case where it was shown affirmatively that the premises were taken possession of by encroachment upon the crown lands, without any pretense of title ; that, for a portion of the premises, the possession was taken about fifty-five years before the commencement of the suit, and for the balance about forty years previous to the same period.   The original possessor died about nineteen years before the commencement of the suit ; and two years after, or seventeen years before issuing the process, plaintiff was ousted, so that for a portion of the premises it was shown affirmatively that there was only a possession of twenty-three years ; that this possession was by encroachment, or squatting, on the crown lands ; that there was no claim of grant or ownership ; and that plaintiff had been out of possession seventeen years.   Upon this state of facts, Graham, Baron, holding circuit at Gloucester in 1809, nonsuited the plaintiff.   Afterwards, before the King's

Bench, the plaintiff moved for a new trial upon the above facts, which was granted by the Court, Lord Ellenborough, Chief Justice, holding that on the above state of facts there was no difficulty in presuming a grant, unless it could be shown that the crown was forbidden by Act of Parliament from granting the premises in dispute, and that it was the daily habit of the Courts to presume grants from the crown upon an uninterrupted possession of twenty years.

Afterwards, upon the second trial, defendant having shown that Stat. 20 Car. 2 absolutely forbade the crown from alienating these lands, the Court held that no grant could be presumed against the express provisions of the statute.

But in the present case there exists no such difficulty as in Goodlittle's case, because the Spanish Governors of the Province of California indubitably had the power to grant the lands of the King of Spain. It is expressly conferred on them by the twelfth section of the Ordinance of 1754 (see 2 White's Recop. 66) and is expressly recognized and upheld by the Supreme Court in *United States* v. *Clarke* (8 Pet. 452) in the most unqualified manner, in a case where the sovereign himself was impeaching the validity of a grant made by his representative. The same doctrine is asserted in 6 Pet. 728, and 9 Id. 759.

It is contended, then, that the doctrine laid down by Lord Mansfield in Cowper, and Lord Ellenborough in Goodlittle's case, applies to the case at issue, notwithstanding that the special verdict shows that there was in fact no grant, and that hence the whole doctrine of presumption of grants is applicable to this case upon the other facts found.

The special verdict shows that Josefa Cota and her children resided on the land until 1843, when she sold to defendant, who then entered into possession.

Manuel Nieto entered into possession in 1784 or in 1790, and the plaintiffs, his grand-children, only lost their possession in the year 1843, and hence a possession of fifty-three years is shown. During this entire period the special verdict reveals successive, continuous, and notorious acts of possession and ownership. "After the death of Manuel Nieto, in 1804, his children continued to

occupy the tract of land above described, with boundaries above specified." "From 1796 to 1833 the said tract, with the said boundaries above specified, were known and respected by the neighbors."

Again: "Juan José Nieto, Manuel Nieto, Josefa Cota, and Catarina Ruis, in 1833, agreed verbally to make a partition of the lands." What greater act of ownership could there be than this? And what more explicit recognition of the ownership than when the Government ratified and sanctioned the partition?

Again, the special verdict says: "The neighbors respected the tract of land with its boundaries." How respected? By submitting to the claim of ownership of the Nieto children, and permitting them to have the sole and exclusive use of this immense tract of land for the benefit of their immense herds of horses and cattle. It is contended, then, that these claims and acts of ownership are sufficient to have forced the Court to have presumed a grant of the premises to them, " for the purpose of quieting the possession."

Why should the neighbors respect the possession of the Nietos unless they were the owners? And why should the officers of the Spanish crown tacitly acquiesce in this exclusive claim and possession unless there was a title?

6 Manning, Granger, and Scott (6 Eng. Com. Law Rep. 861). This case contains an immense quantity of learning and facts. The point in issue was this: In 1564, Queen Elizabeth granted the Manor of Langdon to ancestors of plaintiffs, including the right of wrecks; but the grant was not in such terms as to include the *littus maris*, or the land between high and low water mark, and the *locus in quo* of the alleged trespass was on the *littus maris*. By the evidence upon which plaintiff rested his case, it appears that for at least forty years he had been in the habit of taking from between the high and low water mark sand, ore-weeds, and stones, and that no other person, except the plaintiff, or by his license, had done so. Also, that wrecks had been taken on two or three occasions by the plaintiff, on the *locus in quo*, and applied to his own use. Now here was a grant offered in evidence, and relied on, which excluded the idea of a grant of the *littus maris*.

Per Lord C. J. Tindal: "The grant of Elizabeth gives the

right of wreck, which, according to Lord Hale, affords strong grounds for presuming that the soil between high and low water mark is intended to pass by it.    And there was besides a considerable body of evidence of acts done by the plaintiff, and those under whom he claimed, that raised a strong and almost irresistible presumption that they were the owners of the soil.".

As in the case at bar, the facts negatived the existence of a grant for the *locus in quo*, yet from the acts of ownership for forty years the Court presumed everything that was necessary to sustain plaintiff's right of action.

One other case only will be quoted in final illustration of this principle, decided by the Supreme Court of the United States— *Mitchell et als.* v. *United States* (9 Peters, 759).    This was a claim for near three hundred leagues of land, which was sustained by the Court, thereby reversing the decision of the lower Court.

"Anything which would make the ancient appropriation good, (Cowp. 110) if it could have had a lawful foundation, for whatever may commence by grant is good by prescription.    (1 Roll. Ab. 512; 4 Mod. 55; 1 Saun. 345.)    The length of time which brings a given case within the legal presumption of a grant, charter, or license, to validate a right long enjoyed, is not definite, depending upon its peculiar circumstances.    In this case, we think it might be presumed in less time than when the party rested his claim on prescriptive possession alone.    There is every evidence, short of the sign manual or order of the King, approving and confirming this grant; and if that were wanting to secure a right of property to land which has been held as these have been, the law would presume that it once existed, but was lost in lapse of time and change of Government, the more especially as by the laws of Spain the presumption for the period of ten years has the same effect as twenty years by the principles of the common law."

III.    Whatever might be the truth concerning the original title of Manuel Nieto and his children, yet Josefa Cota, the mother of the plaintiffs, and their natural guardian, and the defendant, her grantee, are estopped from denying the original title of Manuel Nieto and his children to the lands in dispute.

Antonio Maria Nieto, son of Manuel Nieto, and father of plaint-

iffs, being in the peaceable possession of the premises in dispute, claiming to own them, intermarried, in the year 1815, with Josefa Cota, the mother of plaintiffs, and grantor of defendant. Thence, necessarily, Josefa Cota, the wife, made entry in 1815 upon the lands in dispute in subordination to the title of Antonio Maria Nieto, her husband, and continued to reside upon said lands until 1834 under the same title, because it is not contended that she ever acquired any adverse right until 1834.

Luciano Grijalba, who presented the petition to Governor Figueroa upon which the alleged title issued, represents that he acts for Juan José Nieto, who is the head of the Nieto family. Now, Josefa Cota and her grantee, the defendant, claim under the title which Figueroa issued in pursuance of the request of Grijalba; hence they recognize his authority and agency, and are bound by his declarations made within the sphere of his agency. Now, every line of his petition asserts the title of Manuel Nieto and his children; are not Josefa Cota and her grantee bound by his representations? Again: the primary decree of Governor Figueroa of twenty-seventh July, 1833, expressly declares, not only the title of Manuel Nieto and the long and ancient possession of himself and family of the lands described in the map, but declares that he himself had actually seen the title papers issued to Manuel Nieto by Governor Fages; and the alleged grant under which Josefa Cota and her grantee, the defendant, claim title, specifically refers to the primary decree, and recites that the consideration of the instrument itself is the fact that she, Josefa Cota, " had shown that she is entitled to the estate of the deceased Manuel Nieto ;" that she had " had the ancient and peaceable possession of the described premises." Now, then, is not Josefa Cota, and consequently her grantee, estopped, by the recitals upon her title itself, from denying the original title of Manuel Nieto ? It is confidently claimed that she is estopped, and that her grantee, the defendant, claiming under the same title papers, is also estopped. (4 Comyn's Dig. verbo Estoppel, 195.) An estoppel is where a man is concluded by his own act, or acceptance, to say the truth. (Co. L. 352 a.) And it may be by matter of record, of writing, or *in partis*. By matter of record—as if the King by his letters patent grants lands to B,

claiming nothing in the freehold, B cannot say afterwards against the King that he was enfeoffed by A. " So a man may be estopped by acceptance of rent, so by entry, or livery," etc. (Co. L. 352 a.) Then Josefa Cota would be estopped by recitals in grant, because she made entry and claim under it. So, if defendant has entered into possession under the plaintiff, he shall not be permitted while he is in possession to controvert the plaintiff's title. (1 Nott & McCord, 373 n; Teller et al. v. Burtes et al., 9 Johns. 179, 180; 10 Id. 178–435; Hill v. Streeter, 5 Cow. 530; Adams on Eject. 47, note 1.)

In New York, in Phelan and Wife v. Kelley, (25 Wend. 389) this very case is decided. It would be difficult to find a case more analogous. The law in that case, as existing in England and the United States, was clearly laid down by Chief Justice Nelson. It was there held that where the father held a bare possessory right to land, and upon his death his family succeeded to his possession, two of the sons could not acquire an adverse title to that of the father, and that the sister was entitled to recover on the possession of the father, though her brothers had acquired and assigned to defendant the true and valid title. In that case the estoppel worked upon the brothers; in this case it is invoked against the mother, the guardian of the infant plaintiffs, whose special duty it was to protect their rights.

Josefa Cota came into possession in 1815, under the title of Antonio Maria Nieto, her husband, who was in possession, claiming as owner. How, then, can she be permitted to assert an adverse title, or her grantee? The English cases cited in Wendell fully sustain this doctrine (29 English Com. L. 16; 30 Id. 67) and apply it to the grantee.

Upon the death of the father of plaintiffs, in 1832, their mother, Josefa Cota, became de facto and de jure their guardian. At that time it is not pretended that she had any title; but she was in possession under the claim of title inherited by her children, and though living upon the premises in dispute since the year 1815, she never pretended to have acquired any right to the lands previous to 1834, and whatever rights she may have acquired adverse to plaintiffs were acquired in 1834, at a time when they were infants,

Nieto *v.* Carpenter.

when she was their natural guardian, and when she was in possession under their claim of title, and in no other way whatever.

IV.   The documents issued in 1834 by Governor Figueroa, and called grants, and relied on by defendant in his answer as such, are not in fact grants, nor were they intended to be such, but were asked and given simply for the purpose of serving as a solemn and official recognition on the part of the Mexican authorities of the ancient title and possession of Manuel Nieto, held under the crown of Spain, and at the time of recognition descended to and vested in his lawful heirs.

In April, 1822, the Province of California first recognized the successful revolution which established the independence of the Mexican Republic.   This revolution found the children of Manuel Nieto, including Antonio Maria Nieto, the father of plaintiffs, in the peaceable and notorious possession of the entire Nieto tract of land, and making a claim of ownership thereto.   The desire to obtain a solemn recognition of the ancient title of their father from the new and revolutionary Government naturally influenced the children of Manuel Nieto, at the head of whom stood the eldest son, Juan José Nieto, as appears by the petition of Grijalba.   This desire was reasonable.   The tract of land occupied by them was immense, and was daily becoming more valuable beneath the influence of the increasing population of California.   The evidence and the documents in partition reveal the anxiety of the Nieto family to obtain a recognition of the original title.   They constantly made the claim of ownership, while they never petitioned to have the land granted to them.   The petition of Luciano Grijalba to Governor Figueroa expresses two objects : the one, the recognition of the title of Manuel Nieto, rendered necessary by the loss of the original papers ; and the other, the sanction of the Government of the partition, and the issuing of separate documents to the heirs, respectively, of the separate parcels ; and the attention of the Court is particularly called to the fact that this petition asks to have the title of " Santa Gertrudis " issued to Josefa Cota and her children.

In pursuance of the petition of Grijalba, Governor Figueroa determined to recognize the ancient title of Manuel Nieto, and

hence executed his primary decree of twenty-seventh July, 1833. It is respectfully submitted that this decree does not purport to grant, but simply recognizes a preëxistent grant to Manuel Nieto; that it uses no word of concession or grant, but only "declares" them to be owners. The words "declare to be owners," instead of "grant," were used, *ex industria,* because the title having already vested in Manuel Nieto the Mexican Government held nothing in the lands to "grant." How could Governor Figueroa have undertaken to grant that which he declares was already granted by Governor Fages to Manuel Nieto? It is evident that Figueroa was simply complying with the desire of the Nieto family, and recognizing the original title, and sanctioning the partition of the entire tract into four parcels, representing the one-fourth interest of each of the children of old Manuel Nieto.

The recitals in the document given to Juan José Nieto and in the one given to Josefa Cota are precisely alike. In both it is stated that the parties had proved their right to the estate of Manuel Nieto, deceased. What right could Josefa Cota have proven to the estate of Manuel Nieto? None whatever. She was a stranger to his blood, and only represented the right of her children. In neither of the documents is the word "grant" used, but simply the party is "declared to be owner." No new title is conferred or granted, but by virtue of one already existing they are "declared to be owners," and there is a specific reference to the decree of twenty-seventh July, 1833. That these documents were not intended to operate as grants may be gathered from another circumstance, viz.: the omission to insert the usual condition of subjection to the approval of the Territorial Deputation.

Here the counsel will refer to two depositions taken on the trial below. This reference is not made for the purpose of eliciting any facts concerning the case, but proposes simply to aid the Court to decide upon the meaning of the written documents submitted for its interpretation. The depositions are one of C. E. Carr, Clerk of the United States District Court for the Southern District, and the other is Captain H. W. Halleck.

It will be seen from a perusal of these depositions, given by two gentlemen whose position gives them the best opportunities of testi-

Nieto v. Carpenter.

fying intelligently, that in Mexican grants the word " *conceder*, to grant," was a technical word; and that the word " *declarar*, to declare," has probably never been used but in the single case of the Nieto grants; and that grants, as an ordinary rule, always contained the condition of subjection to the approval of the Assembly.

It is an historical fact that Governor Figueroa was an able and educated man, and certainly the most learned of the Mexican Governors; how pregnant with meaning, then, is this variation from the usual form?

As the result of this examination, it is submitted that the document relied on in defendant's answer, and referred to in the special verdict, is not a grant to Josefa Cota, but is simply a solemn recognition of the ancient Nieto title, and delivered to her as the representative of the plaintiffs, and that so far from being a grant to her the said document recognizes and establishes beyond question their title.

It will be vain for the defendant to endeavor to escape from the notice of these facts; the very documents he relies on, the only right he claims, bear proof upon their face of notice. But even this is not necessary. He certainly cannot stand in a better position than his grantor. The case in 25 Wendell, and in 2 and 3 Adolphus & Ellis (19 and 20 Eng. C. L. R.) establish the principle that he is bound in the same manner as his grantor. Nor can it be urged that the plaintiffs have been guilty of laches, as will appear by the following key of their ages, as set out in special finding. Until March, 1850, the Mexican laws concerning minority were in force, and majority was only attained at the age of twenty-five years, and no limitations less than ten years could affect a right to real estate. Petra, the eldest, was of age in 1841, so that in 1850 nine years had only elapsed, and then the new law of limitations extended her right five years from 1850. This action was instituted about January, 1853. Concepcion was of age in 1844, Diego in the year 1848, José Antonio in the year 1850, Maria Dolores in the year 1851, and José Jesus in the year 1852.

*James A. McDougall & Soloman A. Sharp*, for Defendants and Appellants.

I.    The plaintiffs insist that their possession for forty-eight years, although their entry was under a permission to graze cattle, raises a presumption of title in them.

There are several sufficient answers to this.    They all rest, however, upon this simple rule, that there cannot be a presumption inconsistent with and repugnant to an ascertained and acknowledged fact.    The testimony proves, and the Court finds, that Manuel Nieto entered under a written permission ("not a grant of title") to graze cattle.    That after his death his children continued to occupy "under the same permission given to their father," until the grant by Figueroa.    We might insist upon the rule, "*nullum tempus occurrit regi*," and show that it obtained as well in Spain as in England; but we rely upon the much more simple test—the fact which repels the presumption and furnishes the true premises for a conclusion under all systems.

In considering this point, we assume that the Government of Mexico granted to Josefa Cota, in 1833 ; and the question presented is, can the Nietos, by virtue of the presumptions growing out of their possession, prescribe against the Mexican Government ?    The following rules are quoted from the authorities cited.    " Instruments which do not purport to convey title, as leases, contracts, etc., cannot be the foundation of an adverse possession."    (Adams' Eject. 574.)    " There is another objection against setting up any adverse possession under the contract, such possession must not only be hostile in its inception, but must continue so for twenty years."    (*Jackson* v. *Camp*, 1 Cowen, 610.)    " But as the ancestor is proven to have gained the possession not by disseizin but by contract with the owner of the claim, through which the defendant now asserts his right, it is plain that so long as the possession was held, under that contract, it cannot have been adverse to the defendant's title."    (*Higginbotham* v. *Fishback*, 1 A. K. Marsh, 506.)    " Reynolds has, by his admissions, recognized Low as his landlord; he cannot therefore be admitted to dispute his title."    (*Jackson* v. *Reynolds*, 1 Caines, 444; see cases cited and collected in note, Adams on Eject. 40, 41.)

The rule of the Spanish law is not substantially different in this particular.    Ordinary prescription, as defined by Spanish law, is

the acquisition of the ownership of a thing by having the possession of it during the whole of the time required by law.   Its requisites are four : 1st, just title ; 2d, good faith ; 3d, continued possession ; 4th, the time fixed by law.   (Manuel del Abogado Americano, Lib. 2, Tit. 2 ;   Part 3, Tit. 29, Lib. 9 ;   Alvarez, Lib. 2, Tit. 6 ; Sala Mexicana, 2, pp. 73–75 ;   Febrero Mexicano, 1, pp. 348, 349 ; Gomez y Montalban, Tom 1, Cap. 5, sec. 4 ; Escriche Derecho Espanol, Lib. 2, Tit. 2.)   " Title is the cause proper to transfer ownership, as donation, purchase, etc."   (Manuel del Ab. Am. Lib. 2, Tit. 2 ; Alvarez, Lib. 2, Tit. 6.)   " By just title, which is also called colorable title, we understand anything which if it issue from the lord of the thing, may transfer the dominion ; that is to say, sale, exchange, donation, institution of heir, and others, are just ; but deposit, lease, loan, are unjust, because, although they issue from the true lord, the latter did not by them propose to transfer the dominion."   (Sala Mexicana, 2, p. 76 ; see also *Frique* v. *Hopkins*, 4 Martin, N. S. 224 ; *Paschal* v. *Perez*, 7 Texas, 370 ; *Dufour* v. *Camfranc*, 11 Martin, 715 ; *Bowen et al.* v. *Powers*, 3 Martin, N. S. 462.)

It will be clearly seen that in all cases where possession is permitted to establish a prescriptive title, the possession, both in its inception and during its continuance, must have been adverse ; and that when a party or his ancestor entered as tenant, no period of time, however long, will prevent his being estopped from denying the estate of his landlord, whensoever it is asserted.

II.   The position requiring most consideration in this discussion is the one holding Josefa Cota estopped from denying the estate in Manuel Nieto, by reason of the recitals in Grijalba's petition, and the recitals in the decrees and grant to her ; and this for the reason that this position is taken in the opinion in this case on the former hearing.   (7 Cal. 533.)   It was suggested by the counsel for respondents at bar, that this opinion constitutes a part of the law of this case, and that therefore the question is not open to review.   There is no doubt but that the judgment of this Court, however erroneous, becomes part of the law of the case ; so this Court has said, and it has said nothing further.   In this case there was a simple judgment of reversal.   There was a full trial *de novo*,

and while the opinion of this Court amounted to instruction to the Court below, it amounted to nothing more. All judgments become final after the term has expired. The judgment is what the Court declares as to the rights of the parties, not the reasons for the declaration. There is nothing in the judgment to deprive this Court of full power over this case, and it is the assertion of a strange doctrine that the Court cannot now administer the law of this case by reason of the expression of a former erroneous opinion. In *Stearns* v. *Aguirre*, (7 Cal. 448) upon a similar question made, the Court says: "At common law, the Appellate Court either affirms or reverses the judgment upon the record before it. The opinion which is rendered is advisory to the inferior Court, and after the reversal of an erroneous judgment, the parties in the Court below have the same rights that they originally had." It may be proper to mention here, that on the former hearing this question was not fully argued before the Court, at least on the part of the appellant, on account of the brief time afforded counsel for preparation, and for the reason that the facts, history, and law governing the question, were found mostly written in a foreign language.

In entering upon the subject, it is worthy of remark, that neither the sufficiency of the grant by Figueroa to Josefa Cota, nor the regularity or sufficiency of the grant by Josefa Cota to Carpenter, was ever questioned until the institution of this suit. The grant was made by one Mexican Governor (Figueroa). The sale was authorized by another (Micheltorena). The latter was known as a man of learning and ability. The business was transacted before the highest judicial officer of the district; it was acquiesced in by the numerous family of the Nietos; no suspicion of unlawfulness, of technical or actual fraud, arose. Estoppels grow out of technical or actual fraud. The Nietos never dreamed that they had been defrauded until it was discovered after the introduction of our government, people, language, laws, and lawyers. It would seem to be a fair presumption that the history of the Santa Gertrudis Rancho, the conditions, relations, and rights of parties claimants; the relation of the Government to and its power over the property; the signification, force, and effect of grant and contract terms; and

the law of the land as applied to all these considerations, would be as well understood, and as truly recognized, by the officers and people whose business it was to understand the history, language, and laws of the country, and the condition and history of this particular property, as by the representatives of the respondents in this case, who have undertaken to pronounce upon them. That the facts and the law of this case were properly understood, we will now undertake to affirmatively maintain.

The doctrine of estoppel, as known to the common law, was of feudal origin, (1 Greenleaf, 25) and unknown to the civil or Spanish law, and the whole doctrine of technical estoppels has been fiercely assailed by the continental jurists, as one of the great defects of our system. The only rule of the civil law analogous is, that a party shall not take advantage of his own fraud, which corresponds with our law of equitable estoppels, but they have no rule estopping a party from proving the truth, as against his own admissions, either by deed or parol. We have no objections, however, to accept the respondents' own field of controversy, and test this question by the settled rule of the common law.

In 1 Green. Ev., sec. 22, it is said : " The doctrine of estoppel has been guarded with great strictness, not because the party enforcing necessarily wishes to exclude the truth; for it is rather to be supposed that that is true which the opposing party has already solemnly recited, but because the estoppel may exclude the truth. Hence, estoppel must be certain to every intent, for no one shall be denied setting up the truth, unless it is in plain and clear contradiction to his former allegations and acts." In *Sampson* v. *Cooke* (5 Barn. & Ald. 611) Holroyd, J. says: " Estoppels are odious in law, and, being so, they ought not to be allowed, unless they are very plainly and clearly made out." In *Hales* v. *Risley* (Pollexfen, 396) it is said, " Estoppels are odious in law, because they hinder truth. Next, estoppels must be certain and positive, and not by argument or inference." (Coke Ins. 352 b.) " A man shall not be estopped when the truth appears by the same record." (Co. L. 352, b.) " A man shall not be estopped to aver a thing consistent with the record." (Comyn Dig. tit. Estop. E. 3.) " An estoppel against an estoppel sets the matter at large."

(Id. Estop. E. 9.) "A deed poll does not estop a lessee, grantee, etc., for it is the deed of the lessor, grantor, etc., only." (Co. L. 363 b.) "A party is not concluded by acceptance or the like." (Id. 352 b.) "Estoppels must be reciprocal, and bind both parties." (Comyn Estop. B.) In *Heane* v. *Rodgers* (9 Barn. & Cres. 586) Bayley, J. says: "We think that he is at liberty to prove that such admissions were mistaken or were untrue, and is not estopped or concluded by them, unless another person has been induced by them to alter his condition; in such a case the party is estopped from disputing their truth with respect to that person (and those claiming under him) and to that transaction, but, as to third persons, he is not bound. It is a well established rule of law that estoppels bind parties and privies not strangers." In *Newton & Watkins* v. *Liddiard* (64 Eng. Com. L. 925) the same rule as to the necessity of the admission changing the condition of the party is laid down; as also in *Howard* v. *Hudson* (75 Eng. C. L. 11.) The case of *Stronghill* v. *Buck* (68 Eng. C. L. 781) contains, perhaps, the most clear exposition of the rule as to who are bound by recitals or covenants in the deed, and who are estopped by them. In that case it was recited in a deed that certain moneys had been advanced: *Held*, that the recital was to be taken as the language of the defendant only, and did not estop the plaintiff from saying that it was not advanced. "Where a recital is intended to be an agreement of both parties to admit a fact, it estops both parties, but it is a question of construction whether it is so intended."

Adopting the view of the facts of this case, taken by plaintiffs, and testing their position by any one of the foregoing rules, and it will be found that each separate test proves their position false.

Previous to the conveyance to Carpenter, Josefa Cota had made no false allegation; she had made no allegation whatsoever, either by way of petition, recital, argument, or covenant. She had said nothing to Governor Figueroa; she certainly had neither said nor represented anything to these plaintiffs. Grijalba was avowedly only the attorney in fact of Juan José Nieto. Estoppels must be mutual. By what terms, to what extent, in what respects, are the present plaintiffs estopped or bound? The conduct or statements

of defendants' grantor must have operated upon the condition of plaintiffs.     How have they changed their condition ?     By what fraud in fact or in law have they suffered ?     The grant is but a deed poll, in which the grantee says nothing, and therefore has agreed to nothing.     There is nothing in it " intended as an agreement to both parties to admit a fact."     The " acceptance " by Josefa Cota cannot work an estoppel.     If the recital that the Governor had seen the concession would estop the Government, then, in the same instrument, the Government assumes the power, and undertakes to grant, so that while the Government in one sentence admits the title outstanding, in the other it claims the title in itself. If the first term would operate an estoppel, so would the second, and an estoppel against an estoppel leaves the question free.

Admitting plaintiffs' view of the facts, the conclusion is, that there is nothing in the recitals in the decrees and grant by Figueroa which operates a technical estoppel, or estoppel by deed, as against Josefa Cota, or those claiming under her.

The defendant now insists that there is nothing in the decrees or grant of Figueroa, inconsistent with the assumption and proper exercise of the power to grant the entire estate to Josefa Cota. That there is nothing recited inconsistent with the fact found by the Court below, that the Nietos held under a permit in writing, to graze cattle, without other claim of right.     And we insist, if the recitals can be understood consistent with the ascertained fact, they must be so construed.

It will be observed that in the translation of the decree of twenty-seventh July, 1833, adopted by the Court in its former opinion, the term " concession " is rendered " grant."     Upon an examination of the copies of the originals in the record, it will be seen that the character of the concession which Figueroa had seen, is nowhere defined.     The written license issued to Manuel Nieto, was as strictly and technically a concession, as would have been an absolute grant.     Such a concession, with an ancient, peaceable, and undisturbed possession, in connection with the colonization policy and laws of the Republic of Mexico, might have been good reason why the family should be invested with the estate, but would not qualify the power or limit the discretion of the Govern-

ment. Josefa Cota was then in fact possessed. There was no reason why the Government might not make her the grantee, and many reasons might have been urged in favor of such action. It certainly met the views of the family of the Nietos.

It is certainly true that Figueroa did not mean to be understood that he had seen an absolute grant to Manuel Nieto, for the following reasons :

1. There was a concession which he might have seen.

2. There never was an absolute concession.

3. Don Pedro Fages, in 1784 or 1790, had no power to make a grant. This power did not exist in any of the Governors previous to the Revolution, but belonged to the Junta de Hacienda, and was administered by the Royal Intendant. This was matter of notorious history, and it is to be presumed that Figueroa was not ignorant of the fact. (See *Paschal* v. *Perez*, 7 Texas, 368–371; Opinions of the Minister Galindo Navarro, dated twenty-seventh October, 1785 ; Surveyor-General's Office, State Papers, vol. 1 ; Missions and Colonization, 808 ; Instructions of Lopola, Intendant of Chihuahua, to Don Pedro Fages, inclosing the same opinion, and instructing accordingly, dated twenty-first June, 1786, in same volume, Surveyor-General's Office ; Acts and Regulations for the government of the Province of California, approved by Royal order of twenty-fourth October, 1781, to be found in the official report by Halleck ; California Message and Correspondence, 1850, Cong. Doc. 134 ; Instructions of Pedro de Neva, Intendant of Chihuahua, to Romero, Governor of California, March 22d, 1791, to be found in same volume, 139.)

4. It is a fair presumption that the Governor understood the laws he was administering, and the subject matter over which he exercised jurisdiction. It is a very violent presumption that he should grant to Josefa Cota certain lands, and declare to her the ownership, when the right was in others, and he, as Governor, had no dominion over the subject. It is a fairer presumption that he knew and meant to recite the consistent truth.

5. The interpretation of the grant to Cota by all, including the Nieto family, as well as the local officers and governors, and their perfect acquiescence in her right, shows that there was no pre-

tense of right, only a claim of favor, antecedent to the grant in 1833.

This interpretation of the grant by Figueroa is ably maintained in the opinion of the Board of Land Commissioners, before whom both plaintiffs and defendant presented their several claims. It was the peculiar business of that Board to master questions like this, involving the history, laws and language of the country, and therefore their opinion in this case should have the weight of high authority.

III.   Upon the trial and former hearing in this Court, much stress was laid upon the distinction between the words *conceder*, as a technical term of grant, and *declarar*, as one used only in this case, and used as a term of confirmation.

Upon examining, critically, into the meaning and use of those words, it will be found that both counsel and the Court have been led into error on the subject, and that *declarar*, *conferir*, and *conceder*, are used indiscriminately as terms of grant, while *revalidar* is the technical term of confirmation, or rather of reinvestiture, with the muniments of title—for, strictly speaking, if it is admitted that the title wanted confirmation, the fee must then have been in the Government and the Government could have invested any third person with it at pleasure.

(Diccionario de Sinonimos, par Don Pedro Martin, vol. 2, p. 112.) This authority says that the most general use of the words *declarar* and *declaracion*, is, judicially, as *tomar declaracion auto declarativo*. That according to the derivation of the word, it indicates a clear demonstration, an important action, a will resolved and firm. Its most general use is in matters important and necessary for all to know ; as, for instance, laws, ordinances, and decrees and regulations ; and for this reason, the Government uses it in its publications, proclamations, edicts, etc.   In the official report of Wm. Carey Jones to the Secretary of the Interior is given the ordinary form of grants made by Gov. Figueroa, from which we extract as follows :

" In virtue of the powers conferred upon me, in the name of the Mexican Nation, by decree of this date, I have determined to grant (*conceder*) to the said Estudillo the tract of Temecala aforesaid, declaring it by these presents to be his property."

It will be perceived that the last term is the operative one in the instrument. We give the following further examples, to be found in the office of the Surveyor-General:

" Using the faculties on me conferred, in the name of the Mexican Nation, (*Lo Declaro a las Señores Palomares y Vexar dueños en propiedad del paraje mencionada*) I declare the citizens Palomares and Vexar owners in property of the aforementioned place."   *   *   *   *   *   JUAN B. ALVARADO."

" In conformity with law in relation to the land solicited (*Lo Declaro á José de la Lus Sirner dueño en propiedad por las presentas letras*).                     JUAN B. ALVARADO."

*Libro de Razon*, Surveyor-General's office, No. 67, grant by Figueroa.

"*Por Cuanto Maria del Carmen Rodriguez y Hermanos, Mejicanos por nacimiento, ha pretendido por su beneficio personal la propiedad del terreno conocido por el nombre de Conejo, usando las facultadas que me son conferidas en decreto de esta dia, y á nombre de la Nacion Mexicano, hevenido en declarar la propiedad.*"

Same volume, No 89: "*En nombre de la Nacion Mexicano se declara dueño absaluto del terreno mencionada.*" Grant by José Castro. The same volume, No. 46, grant by Figueroa; No. 100, grant by Outierres, and No. 101, grant by Gutierres, the same language is used. In case No. 93, in the same volume, Governor Figueroa revalidates a grant to Vallejo, using these terms: "*En revaledacion de una concesion hecho par Don Hablo Becinte de Sola, 23 de Febrero, de* 1823."

Of the twenty original grants made by Governor Castro, and to be found in the Libro de Razon, nine have the words: "*He venido en conferir;*" seven have the words "*He venido en declarar,*" and only four have the words "*He venido en conceder.*" Governor Alvarado used the words *conceder, declarar, conferir,* but *declarar* most frequently.

The conclusion from the signification and use of this word must be, that so far from its qualifying the grant to Josefa Cota, it exhibits the exercise of the highest and most complete power of the

Government in investing her with the estate, and that thereby the estate was not merely conceded, but was also adjudged to her.

The decrees and grant of Figueroa, in all respects in which they are peculiar, are to be understood thus: A claim is presented by the persons in possession of certain premises, addressed to the equitable consideration of the Government. In the exercise of the full power of the Government, and having jurisdiction and dominion over the subject matter, for sufficient cause shown, the Governor grants the application, and not only concedes, but adjudges to the respective parties named in the grant, the premises in question.

Had the Governor this power? It is found that the title remained in the Government, and if so, he certainly had the power, and it seems to us that, if it is conceded that he had the power, and if it is the fact that he exercised it, by making a grant to Josefa Cota, no technical speculations can be given force sufficient to defeat her right.

IV. Assuming that the possession of Josefa Cota was for and on account of the heirs of Manuel Nieto or the children of Antonio Maria Nieto, the order of Governor Micheltorena was sufficient to justify the sale to the defendant.

In the former opinion (7 Cal. 534) this Court says: "This view of the legal effect of the grant by Figueroa to Josefa Cota would be conclusive upon the rights of the parties, were it not for a fact in the record upon which there appears to be no finding of the Court, and which seems not to have entered into consideration in the decision of the case below: that is, that the sale to Carpenter, the grantor of the defendant, was made in pursuance of a decree of the Court of First Instance of Los Angeles, and that the Judge of said Court made said order of sale in conformity with the direction in writing of Micheltorena, at that time Governor of California, vested with plenary powers. It is in evidence that these were based upon the representations of Josefa Cota, the natural guardian of the infant heirs, and that the land was sold and the proceeds applied to their maintenance and support. Now, whether the Court of First Instance had the inherent power to order a sale in such cases or not, is a matter of little consequence, inasmuch as the proceeding was authorized by the Governor, who

was invested with all power, and whose acts the law presumes to have been done correctly. On this point we are satisfied that the plaintiffs are not entitled to recover."

Adopting the opinion of this Court as to the power of Governor Micheltorena, and also as to the effect of the testimony adduced, it would seem unnecessary to do more than suggest that we are now relying upon this defense, as well as upon the others suggested.

The Court below seems to have taken the position that a judicial act was required on the part of the Judge of the First Instance, by regular proceeding before him, to which the children should by some form of proceeding have been made regular parties, and that without such judicial act on his part, the conveyance to Carpenter would only operate to invest him with the estate of Josefa Cota.

This position is in direct opposition to the opinion of this Court, that the Governor possessed the power himself to authorize the sale—that is, to invest Josefa Cota with the power to sell. The term " authorization," as ordinarily used, is the mere celebration of the act by the Notary, and this was all that under the directions of the Governor, the Judge had to do ; the Governor had invested her with power to sell.

As for the heirs not being notified, it is to be remembered that Josefa Cota was their natural guardian, and could herself apply in their behalf. Besides this, Micheltorena had jurisdiction over the subject matter, and over all the persons, and it is to be presumed that he exercised this jurisdiction regularly. The subject matter was the rancho Santa Gertrudis. Josefa Cota asks permission to sell and convey it, on account of her numerous family, their poverty and their necessities, and because, without such permission, it will be lost to her and them. All this the Governor had the right to consider, did consider, and for these reasons did empower her to sell and convey the Rancho Santa Gertrudis.

This is the particular thing she was authorized to do. This she undertook to do, and did sell, and did convey ; and under that conveyance we hold. It would seem that the only question which could arise here would be one of power in the Governor, and as this Court has affirmed the power, and as it has not been questioned in argument, and as we believe it to be beyond dispute, we

Nieto *v.* Carpenter.

will simply refer to the instructions to Micheltorena of the eleventh February, 1842, to be found among the archives, in which it is said, " He (the President) has been pleased to grant to your Excellency, over and above the attributions assigned to you by the existing laws and regulations as Governor, Commandant-General, and Inspector, all the power which the Supreme Government can confer on you."

*Brent, Saunders,* and *Heydenfeldt,* for Plaintiffs and Respondents, in reply.

I.   It is contended that no estoppel can operate, because Governor Fages had no power to grant to old Nieto, and that there can be no estoppel against the law.

Governor Fages had the power. The only title the Peraltas had for a tract of land known to contain near six leagues was a grant of Governor Sola, dated eighteenth of August, 1822. The counsel for the United States made the point that Governor Sola had no authority to make the grant; and among other things relied on was the letter of the Commandant-General of the Internal Provinces, of 1786, now produced here by appellant. It was not claimed that Governor Sola had other power than the Spanish Governors possessed. The Supreme Court held the title valid, and remarked as follows : " It is sufficient for the case that the archives of the Mexican Government show that such power has been exercised by the Governors under Spain, and continued to be so exercised under Mexico, and that such grants made by the Spanish officers have been confirmed and held valid by the Mexican authorities." (*United States* v. *Peralta et al.,* 19 How. 347–8.)

But even if Governor Fages had not the power to make a perfect title, he could grant an inchoate title, and this could be confirmed by Governor Figueroa. We now hold our title from his action, and the solution of this question is to be found rather in the power of Figueroa than in its absence in Fages.

The case in 7 Texas has no relevancy. There, the action at law was on a title issued by the Governor, which upon its face recited that a confirmation should be sought from the Intendant at San Luis Potosi, whose powers were based upon a royal ordinance of 1805. But this is a totally different case.

Governor Figueroa had the absolute power of disposing of the public domain, and his recital estopped the Government. The appellant contends that estoppels must be mutual, and that here the heirs are not bound. But the estoppel is mutual upon the subject matter. Upon the heirs taking and accepting this estate, then they are equally estopped with the Mexican Government to deny their own title, and their mode of acquiring it.

This estoppel operates on the Mexican Government, and hence equally binds all who claim under that Government; and Josefa Cota and Carpenter so claim, and therefore they are alike estopped.

Suppose the fee of the land was in the Government of Mexico, Governor Figueroa could dispose of it as he thought proper, and he has vested it, by his acknowledgments and confirmation, in respondents.

II.  It is contended that, admitting that in 1843 the possession of Josefa Cota was for and on account of the heirs of Manuel Nieto, or the children of Antonio Maria Nieto, the order of Governor Micheltorena was sufficient to support the deed to the defendant. The Judge of First Instance, *virtute officii*, was a Notary Public, but the offices were as distinct as if belonging to different persons. The deed was authorized by the Notary alone. It recites that the parties appeared " before the officer, and before my witnesses of assistance, with whom I acted as a Notary Public, there being no Notary Public."

It cannot be contended that the officer acted judicially, when the special finding, the deed, and the deposition of the officer, declare that he only acted notarially.

The Court is warned from attaching any force to the words " authorized the sale," beyond the meaning that " the deed was acknowledged by the Notary," because the Spanish use the word " *autorisar* " (to authorize) as applicable to the execution of an instrument in the presence of the Notary, and its authentication by his signature, precisely as the French express the same idea by the equivalent word " *autoriser;*" but this has reference only to the notarial act, and not to any judicial function.

When Carpenter and Josefa Cota appeared before the Notary to execute the deed, they exhibited the Figueroa document as

Josefa Cota's title.   The first condition of that grant forbade the alienation of the lands claimed to have been granted.   The Notary suggested this as a difficulty to the execution of the deed ; and both he and Josefa Cota applied to Governor Micheltorena to know if the first condition was an obstacle to the sale.   Micheltorena instructed the Notary that the condition against alienation was invalid, and that in the sale in question, and in other sales of grants containing like conditions, he should disregard it.

There was no question made of the right and title of the plaintiffs in these proceedings.   There is nothing to show that Governor Micheltorena ever saw the grant, and he only gave his direction that a condition forbidding alienation was to be disregarded in this and other cases.   He must have supposed that the lands belonged to Josefa Cota, and there is nothing in the evidence or finding to show that, for a moment, he supposed he was passing upon the rights of the plaintiffs.

If it were necessary, it might be clearly shown that Micheltorena had no power to interfere with judicial proceedings, and act as a Probate Judge ; but the special finding shows that he did not so undertake to act.   The extent and limitations of his power are as susceptible of demonstration as any other well authenticated fact.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

This case was before the Court at the April Term of 1857, and the facts upon which the decision then rendered was based are given either in the statement of the Reporter or the opinion of the Chief Justice, found in 7 Cal. 527.   Some other material facts are disclosed by the record, to which no reference is made, either by counsel in their briefs, or by the Chief Justice in his opinion.   The translation, too, of the documents set forth in the report is inaccurate in several particulars ; and the misstatements arising from this circumstance, it is evident, had no slight effect in producing the decision.   The judgment of the lower Court was for the defendant ; this Court reversed the judgment, and remanded the case for a new trial.   On the retrial judgment passed for the plaintiff ; and the case, on appeal of the defendant, was again before the Court

at the July Term of 1858. By the decision then rendered the judgment of the Court below was reversed, and that Court directed to enter judgment for the defendant. A rehearing having been afterwards granted, the case was reargued at the October Term, 1859, when the previous decision on the second appeal was affirmed. No opinion was given on that affirmance, but we stated at the time that so soon as the pressure of other business would permit we should prepare and file one in the case. We propose now to state the grounds upon which we rested our decision.

The action is ejectment for the possession of a tract of land known by the name of " Santa Gertrudis," situated in the county of Los Angeles. By stipulation of the parties the records on the two appeals are considered and referred to as constituting only one record, and as filed on the present appeal. All the facts disclosed by the two records are therefore before us, and we are not restricted to those specially found by the Court. A motion for a new trial having been made, we are at liberty to look into the evidence to see whether the findings cover all the material matters presented for consideration. (*Riley* v. *Heisch*, 18 Cal. 201.)

The material facts of the case are as follows: In 1784 Manuel Nieto obtained from Pedro Fages, the Military Governor or Comandante of California under the crown of Spain, a written permission to graze cattle on a tract of land, now embraced within the county of Los Angeles, bounded on the south by the ocean, on the east by the river Santa Anna, on the north by the old road leading from San Diego to Monterey, and on the west by the river San Gabriel, containing thirty-three leagues. Under this permission Manuel Nieto entered upon the tract with his cattle and other property, and laborers, constructed a house and corral thereon, and continued in the occupation of the premises until his death in 1804. His four children, José Antonio, Juan José, Manuela, and Antonio Maria, continued in the occupation, after his death, under the same permission. But while thus in occupation the children claimed to be the owners of the premises.

In 1815 Antonio Maria married Josefa Cota, and the plaintiffs, with the exception of Dryden, are the children of this marriage.

In 1832 José Antonio and Antonio Maria died, the first leaving Catarina Ruis, and the second Josefa Cota, widows.

In 1833 the two sons living, and the widows, agreed verbally to a partition of the premises, and to apply to the Governor for grants to them, respectively, corresponding with the divisions made.   The premises were accordingly divided between them.

Afterwards, on the twenty-sixth of July of the same year, Luciano Grijalba, as attorney for Juan José Nieto, presented a petition to the Governor, asking that separate titles be given to each of the parties for the portions received by them, respectively, in the partition made—" the place called Santa Gertrudis to Josefa Cota and her children, as widow of Antonio Maria, deceased "— representing that in the year 1784 Governor Fages had granted the premises to Manuel Nieto, their ancestor, and given him the possession thereof, and that his heirs had continued in the possession after his death, but that the title papers had been misplaced.

On the following day—July 27th, 1833—the Governor made a decree declaring the parties for whose benefit the petition was presented owners of the premises in fee, and designating the portion falling to each.   The portion known as " Santa Gertrudis " was declared to belong to Josefa Cota, the widow of Antonio Maria. By the same decree the Governor directed that juridical possession be given to the respective parties, and that a copy of the decree be furnished to them to protect their rights until the title papers could be prepared.   This decree is preceded by a recital of the considerations operating upon the mind of the Governor to make it. The translation of this portion, as given in the report in 7 Cal. 580, is as follows : "*Having seen* the present petition, and having known from public notoriety the peaceable and undisturbed possession which has been enjoyed by Manuel Nieto and his heirs of the land described on the map ; *having seen* the proceedings wherein was contained the *grant* of said land by his Excellency Governor Pedro Fages to the said Nieto, complying with every requisite deemed necessary, in strict conformity with the laws and regulations upon such subjects, under the considerations expressed therein, they are declared owners in fee simple."   This translation is inaccurate.   As translated, the recital conveys the impression that the Governor had actually seen a grant from Fages, and was regarded by Mr. Chief Justice Murray, in his opinion, as containing a statement to that effect.

(7 Cal. 533.)    But the words translated by the terms "having seen," in both instances where they occur, do not refer to any inspection of the petition and proceedings, but only mean that in consideration of them he acted, and might be properly translated by the terms "in view of," or "considering" them. And the word translated by the term "grant" does not necessarily import an absolute transfer of the land, as appears to have been considered in the opinion referred to. It should be translated by the term "concession," and is as applicable to the license under which the Court finds that Manuel Nieto entered as to a transfer of the title.

On the twenty-first of December following the Governor made a further decree, directing the execution of the titles, and the delivery of juridical possession; and on the twenty-second of May, 1834, issued grants to the different parties. The one issued to Josefa Cota recites that she had shown herself entitled to the estate of the deceased Manuel Nieto, and declares the ownership of the place called "Santa Gertrudis" to be in her, and directs that she be put in legal possession thereof. The grant is subject to the usual conditions of grants in colonization. It requires her to submit to the regulations made for the distribution of the vacant lands; it prohibits any alienation or division of the premises granted; it confers a right of possession; it requires the construction of a house within a year; it reserves any surplus over the designated quantity to the uses of the nation; and it subjects the right of the grantee to forfeiture upon non-compliance with the conditions annexed.

In March, 1835, juridical possession of the tract thus granted was delivered to the grantee, and from the time the grant was issued until December, 1843, she resided with her children upon the premises. In 1843, being in indigent circumstances, and unable to support her family, or maintain the possession of the property, she applied to the Alcalde of Los Angeles, who was then invested with the powers of a Judge of the Court of First Instance, to authorize a sale of the premises to the defendant. The Alcalde hesitated in regard to his authority, as the grant contained a condition in restraint of alienation, and consulted the Governor upon the subject. The grantee also applied to the Governor for an order for the sale. Thereupon the Governor directed the Alcalde to

authorize the grantee to make the sale; and also directed him, when there was a condition of non-alienation in a grant, to disregard the same in his official acts. Under this direction the Alcalde authorized the sale, acting in that respect and in making the sale, as Notary Public. The premises were accordingly conveyed to the defendant, in December, 1843, for a full and valuable consideration, and formal possession was delivered to him. The sale was made with the knowledge of the plaintiffs, and without any objection from them. At the time, the defendant had no notice of any title other than that derived from the grant of Figueroa, and from the date of his purchase he continued to possess and enjoy the premises without disturbance by any one, and until the institution of the present action, in January, 1853, without the assertion of any adverse title. During this period he made valuable improvements upon the property. In 1847 Josefa Cota died.

Upon these facts the plaintiffs seek to recover, and they rely :

1st. Upon presumptions of title arising from the ancient possession of their ancestors ;

2d. Upon the averments in the petition of Grijalba, and the recitals in the decree and grant of Figueroa, as estopping the grantee, and parties claiming under her, from denying that the title to the premises was originally in Manuel Nieto, and afterwards in his children ; and

3d. Upon the operative words of the grant, as establishing that the grant was issued in confirmation of a previously existing title in the heirs of Nieto, and not as a concession of a title existing at the time in the Government.

In considering these positions we do not feel any embarrassment from the views expressed by the Court when the case was here at the April Term of 1857. The whole stress of the opinion of the Chief Justice rests upon an inaccurate translation of the decree of July 27th, 1833. "The findings of the Court below," says the Chief Justice, "that Manuel Nieto, the ancestor of the plaintiffs, entered into possession by virtue of a permission or license from the Spanish Government to graze his cattle thereon, and not under a deed or grant, is undoubtedly correct, if drawn alone from the parol evidence adduced to rebut the presumption of a grant, which

would arise from his ancient possession and occupation, for the presumption of a grant arising from these circumstances, like any other presumption, may be rebutted by proof. The finding of the Court, however, in the present case, as we think, was against the legal effect of the decree of July 27th, 1833, which expressly recites that the land in question had been *granted to Nieto*, and that he (the Governor) had *seen the proceedings* wherein was contained the grant of said land by his Excellency Governor Pedro Fages. Admitting, for the sake of the argument, Nieto never had any title to the land in dispute, except a mere permission to occupy—in other words, that he was a mere tenant at will of the Spanish crown—still it cannot be denied that even if the fee was in the Government of Mexico, at the date of this decree, she would be estopped from denying the title of Manuel Nieto and his heirs. In other words, whether the land belonged to Mexico or not, Figueroa, as the political chief of the territory, had the authority to bind the Government by his acts or admissions in relation to the public lands, and having by a solemn decree declared *the title of said lands was originally in Manuel Nieto*, the Government was estopped from denying such admission or regranting the premises to another."

This extract shows that the Court, relying upon the correctness of the translation, held that a declaration of the Governor that the property had been absolutely granted to another, and that he had seen the grant of the property, operated as an estoppel against a subsequent denial of the alleged fact by the Government. But as it appears from an inspection of the original document no such fact was in truth averred, the ruling based thereon can have no application in the determination of the case as now presented. We admit that a previous ruling of the Appellate Court upon a point directly made is, as to all subsequent proceedings, a final adjudication, from the consequences of which the Court cannot depart, nor the parties relieve themselves. (*Phelan* v. *San Francisco*, 20 Cal. 39.) But such ruling, if relating to a matter of fact, can only be invoked when the fact reappears under the same circumstances in which it was originally presented. The document now before us neither reads nor means the same thing as when examined by the Court on the first appeal. We proceed, then, to the consideration of the propositions presented by the plaintiffs.

1. They insist that the long uninterrupted possession of their ancestors—that of their grandfather, Manuel Nieto, from 1784 to 1804, a period of twenty years; and that of their father, Antonio Maria Nieto, from 1804 until his death in 1832, a period of twenty-eight years—raises a presumption of title sufficient to maintain the present action.    To this position there is a perfect answer. Presumptions are only indulged to supply the absence of facts. There can be no presumptions against ascertained and established facts.    Here the original entry and subsequent occupation of Manuel Nieto were under a mere permission to graze cattle, and not under any grant of title, and his children continued the occupation under the same permission.    This is clear from the evidence, and is found as a fact by the Court.    The presumption, therefore, of a grant from the long possession, is repelled and destroyed by the production or proof of the contents of the instrument under which the possession was held.    The children, it is true, of Manuel Nieto, claimed after his death to be the owners of the premises; but the assertion of this claim only shows an erroneous impression on their part of the rights conferred by the permission to their father.    The fact found is that they occupied under the permission. The claim asserted arose, therefore, from a mistaken construction of the effect of the permission in transferring the title.

Nor could any title accrue by prescription to the ancestors of the plaintiffs from their occupation under the permission in question. Under the Spanish law, where title by prescription is founded upon possession under a written instrument, it is essential that the instrument should purport on its face to pass the title.    "There is a good deal of confusion," says the Supreme Court of Louisiana, "and some apparent contradiction in the books which treat of the title necessary to form the basis of the prescription *longi temporis*. The correct doctrine, we think, is this: that if the title, under which the acquisition is made, be null in itself, from defect of form, or discloses facts which show the person from whom it is acquired has no title, it cannot form the basis of this prescription, because the party acquiring must be presumed to know the law, and consequently wants the *animo domini*, which is indispensable in cases of this kind.    But where the title is free from these defects, and the

32

property is not transferred, by want of title in the party making the transfer, then it forms a good ground for the prescription; or, in other words, the inquiry is, whether the error be one of fact or of law." (*Frique* v. *Hopkins*, 4 Martin's N. S. 224.). The ordinary requirements of prescription, according to the Spanish law, are four : 1st, just title ; 2d, good faith ; 3d, continued possession ; 4th, the time fixed by law. " By just title," says Sala, " which is also called colorable title, we understand anything which, if it issue from the lord of the thing, may transfer the dominion; that is to say, sale, exchange, donation, institution of heir, and others, are just ; but deposit, lease, loan, are unjust ; because, although they issue from the true lord, the latter did not by them propose to transfer the dominion." (Sala Mexicano, 2, p. 76.)

A similar rule prevails at the common law, where an adverse possession under a written instrument is asserted. Instruments which on their face do not purport to transfer the title, as leases, cannot be the foundation of an adverse possession. Contracts to convey, where the consideration has been paid, and which equity would specifically enforce, constitute perhaps an exception. (*Frombois* v. *Jackson*, 8 Cowen, 589.) The possession of an occupant is, in the first instance, presumed to be rightful and adverse to any other claimant. But " the presumption which the law thus raises in favor of the actual occupant," says one of the Senators in his concurring opinion in the case cited, " may be destroyed by proof of his having a lease or evidence of his having paid rent, or acknowledged the title set up ; or it may be destroyed by showing that the occupant entered without pretending to any claim of right whatever ; in which case the law adjudges the possession to be in subservience to the legal owner, (16 John. 301) for he can derive no benefit from a legal presumption, who, by his own acts, shows that the presumption cannot apply ; the fact that no claim of right was made showing that none existed." (8 Cowen, 617.)

To establish a prescriptive title under the Spanish law, or to constitute a foundation for adverse possession at the common law, the instrument under which the occupant entered and claims the premises must purport in its terms to transfer the title—must be such as would, in fact, pass the title had it been executed by the

true owner and in proper form, (with the exception, perhaps, of a contract to convey after payment of the consideration) and the occupant must have entered under it in good faith, in the belief that he had a good right to the premises, and with the intention to hold them against the whole world. The possession must have been adverse in its inception and during its continuance.

2. There is nothing in the averments of the petition of Grijalba which can estop upon Josefa Cota, or the defendant claiming under her, from denying that the title to the premises was originally in Manuel Nieto, and afterwards in his children. It does not appear that Grijalba was authorized to act for Josefa. He does not profess to thus act, nor is it shown that she had ever seen the petition to the Governor, or knew of its contents. But even if the facts were otherwise, and she had seen the petition and knew its contents, we do not perceive that any estoppel would be created against her. The petition is no part of the grant. It is only the declaration of the party who made it, or of the party by whose authority it was made. Like any other declaration, it is open to explanation. The grant is the operative instrument, and the representations made to the Governor cannot control the course or nature of the title. If those representations were in truth erroneous, and the mistake in them affected the grant in any respect, the fact could only be made available by the Government. But the truth is, the averments of the petition are to be considered, like the claim of ownership made by the children of Manuel Nieto after his death, in connection with the established fact, that the children occupied under the permission granted to their father ; and thus considered, the averments are only the erroneous conclusions of Grijalba as to the legal effect of the permission in transferring the title. Such erroneous conclusions may very well have been drawn by him, as the nature and character of the permission could only be stated from recollection, the original paper having been lost. The " testimonial " furnished of the evidence found in the archives in reference to the alleged ancient title, appears, from the petition, to have been only sufficient to prove the legality of the occupation of the premises. It could not have shown a transfer of the fee of the property, for, in that event, it is not to be supposed that any new or further grant would have been sought.

The recital in the decree of July 27th, 1833, made upon this petition, when correctly translated, is entirely consistent with the fact that a mere provisional license to occupy and graze had been issued by Governor Fages. The term translated " grant " would, as we have already stated, be more correctly rendered " concession." And the provisional permission to Manuel Nieto was as strictly a concession as would have been an absolute grant. This concession and the long occupation of the parties may very well have induced Governor Figueroa to vest in them the title. His power under the colonization laws and regulations authorized him to cede the land if the title still remained in the Government. He knew, or might have known, whether it did thus remain. He assumed that it did and acted accordingly, and declared the parties owners of different parcels of the premises, pursuant to a verbal partition made between them, and directed juridical possession to be delivered to them. It is, certainly, as counsel very justly observe, a fair presumption that the Governor understood the laws he was administering and the jurisdiction he had over the premises, and a very violent presumption that he would declare the ownership of particular lands to be in Josefa Cota when the title was already vested in others, and he had no power or disposition over it. We agree with counsel that the more reasonable presumption is that he knew and intended to recite the consistent truth.

The recital in the grant to Josefa Cota, that she had shown herself entitled to the estate of the deceased Manuel Nieto, does not show that any title had previously been issued to him. The estate to which reference is thus made was only the interest which Nieto had acquired by his license to occupy. Whatever rights that gave, Josefa, according to the recital, had shown herself entitled to. The recital operates in all its particulars, if at all, and not merely in some of them. If it estop the grantee from denying a previous title in Manuel Nieto, it equally shows that she had in some way become invested with such title, whatever it may have been.

3. There is nothing in the operative words of the grant to Josefa Cota which show that the grant was issued in confirmation of a previously existing title in the heirs of Nieto, and not as a concession

of a title existing at the time in the Government. The words used "declaring to her the ownership" of the premises, when taken in connection with other parts of the instrument, clearly show a transfer of the property. A similar position to that of the plaintiffs' counsel was taken before the Board of Land Commissioners when the grant was under consideration by that tribunal, and it was held untenable. "The grant," says the opinion of the Commissioners, "in its terms is totally inconsistent with such a supposition. If he (the Governor) regarded the title of these heirs already perfect in the land, how could he annex the conditions which this grant contains? How could he declare a title already perfect forfeited, if a house was not built upon the place within a year? How make a compliance with the terms of a future colonization law a condition of the holding of that estate? If he regarded this title as already perfect, the heirs already invested with an indefeasible estate under the former grant, one which withdrew the land from his authority, under his power to grant the national domain, he could no more annex conditions to that title, and declare it null if they were not performed, than he could abolish the title altogether and unconditionally. The truth is, that the whole record shows that he did not regard the rights of the parties under any concession made by Fages as establishing private ownership and title in them, and making a new grant both unnecessary and without validity. Instead of showing an admission of Governor Figueroa of such prior title, under the grant from Fages, it presents conclusive evidence that he regarded such a grant, whatever it was, as having no such effect, but on the contrary he proceeded to make a concession of the premises, on the principles and under the conditions provided in the law of 1824, and the regulations of 1828, from which he derived his power over the subject.

"The concessions under the Spanish authority, made in the Californias before the independence of Mexico, do not purport to be perfect titles; at least none of that character have fallen under the notice of this Commission. One only has received confirmation, and that on the ground that an equitable, though not a legal title, was established. The old grants were generally mere rights of possession or provisional grants, and in almost every case, when the

Government was established after the Mexican revolution, the parties applied for new grants, which they received, not as a mere evidence of a former subsisting title, but in the form, and under the terms, and subject to the conditions imposed by the law of 1824 and the regulations of 1828.   Under these, the power of the Governors over the public domain was defined.   It was a power to grant under certain conditions, not a power to recognize and give new evidences of private titles already existing, without conditions or limitations.   He had entire discretion as to choice of grantees, and this power enabled him to do most ample justice to persons who. held under provisional grants previously issued, or who occupied without a shadow of title, or the right to the possession.   All these presented themselves to the new authorities for concessions under the new order of things, and usually received grants for the ancient possession.   The archives of this Commission are full of such documents, and the custom was all but universal."

The views we have thus expressed dispose of the case on the part of the plaintiffs, and render it unnecessary to consider the numerous objections urged to a recovery by the defendant.   The title vested in Josefa Cota by the grant to her.   The motives which induced the action of the Governor do not affect the title. As counsel observe, the title lies in the grant and not in the motives.

The Governor had authority to remove the restraint upon the alienation of the premises contained in the first condition of the grant, and the subsequent sale of the grantee to the defendant passed the title to him absolutely.