## ESTATE OF GERSHOM P. JESSUP, DECEASED.

[No. 5681; decided March 29, 1891.]

New Trial—Law of the Case.—The Rule that the Lower Court on the retrial of a case sent back by the appellate court must follow the law laid down by the superior tribunal can be invoked only when the same facts and questions are presented on the second trial.

Illegitimates—Acknowledgment by Parent.—The Declarations of a Man since deceased are admissible to prove that he was the father of an illegitimate child who claims to have been legitimated by public acknowledgment.

Illegitimates.—In Order to Constitute a Public Acknowledgment of an illegitimate child by his father, the father must treat, receive or acknowledge the child as if he were his own legitimate offspring; and in order that proof thereof may be made by disinterested parties, and fraud and imposition avoided, all of these must be done openly and publicly, not secretly.

Illegitimates—Reception into Family.—The most satisfactory way of establishing the paternity and public acknowledgment of an illegitimate child is by proof that he has been received into the family of the father and given the family name; but this is not necessary where there is sufficient proof of a reason for not having done either.

Illegitimates—Acknowledgment by Parent.—The evidence in this case is held to establish that the petitioner was the illegitimate child of the decedent (an unmarried man), and that the decedent publicly acknowledged his paternity of the petitioner.

Illegitimates—Acknowledgment by Parent.—The institution of heirs is the primary object of section 230 of the Civil Code. The succession of property rights is incidental; it is a status that is involved, the relation of the child to society.

Illegitimates—Construction of Code Sections.—Section 230 of the Civil Code, relates only to minors, who alone are subjects of adoption, and section 1387, provides for giving to illegitimate adults the capacity of inheritance. The latter section is not a limitation on the former one.

Gershom P. Jessup died on November 2, 1886, leaving a will dated August 28, 1867. The will was admitted to probate on November 22, 1886, and letters testamentary issued to S. O. Putnam and Isaac Jessup, the executors therein named.

The testator was never married, and his entire estate was devised to his brother Isaac and his two sisters.

On April 11, 1887, the petitioner, describing himself as Richard P. Jessup, filed his petition, in which, after stating the preliminary facts showing the condition of the estate, etc., he averred that he was the son of the testator and Josie Landis, deceased; that he was born in San Francisco on March 20, 1866; that his parents never intermarried nor lived together as husband and wife, but that the testator publicly acknowledged petitioner as his child, and treated him as if he were a legitimate child, and thereby adopted him as such.

The petitioner was not mentioned in the will, and claimed the estate by virtue of section 1307 of the Civil Code.

The executors, by their answer, put in issue the question of the paternity of the petitioner and the question of his adoption. A trial resulted in favor of petitioner. Upon appeal the judgment of the trial court was reversed. (In re Jessup, 81 Cal. 408, 21 Pac. 76, 22 Pac. 742, 1028, 6 L. R. A. 594.)

The opinion which follows was rendered on a retrial, after the case came back from the appellate tribunal.

Henry I. Kowalsky, for the petitioner (W. H. L. Barnes, of counsel).

John H. Dickinson, for executors (John Garber and D. M. Delmas, of counsel).

COFFEY, J. This matter comes before this court for a second and a new trial, having been remitted hereto by the supreme court, upon the ground that under the evidence in the former trial the decedent herein never did publicly acknowledge the petitioner as his own child, nor receive him into his family, nor otherwise treat him as if he were a legitimate child, and that the evidence was insufficient to justify the decision of this court upon the first hearing of the application, which decision was rendered on the third day of March, 1888: In re Jessup, 81 Cal. 434, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.

It is to be expected, as counsel for respondent contends, that something has been settled by the decision of the supreme court, that some rules of law have been established as a guide for the trial court, and that, when the appellate

tribunal has sent back a case, the nisi prius court must follow implicitly the law as laid down by its superior; the principles of law which are thus determined must be respected, and when the facts are the same this doctrine must prevail; the judgment of the supreme court, as given in the prevailing opinion, binds this court upon a retrial. A cheerful acquiescence in the views of the superior courts is the duty of the inferior tribunals whose judgments have been reviewed and reversed (Oakley v. Aspinwall, 1 Duer, 1); and no matter how repugnant to the reason and judgment of the trial judge the decision of the court of appeal may be, it is his bounden duty to obey without question and conform with respect; but where the facts are not the same, or are essentially stronger, this rule cannot apply; and when the evidence is stronger, or when the facts do not reappear in the same circumstances, the rule has no application.

It is upon the questions of law alone that it applies.

Such a rule can be invoked only when the fact reappears in the same circumstances in which it was originally presented (Nieto v. Carpenter, 21 Cal. 488); and the same questions must be presented on the same state of facts: McKinlay v. Tuttle, 42 Cal. 576.

So the question before the court upon this second trial may be stated shortly: "Is this the same state of facts dealt with in 81 Cal.?"

I do not understand that the question of paternity of the petitioner was specifically remitted to this court, for after repeated and respectful readings of the prevailing opinion in this case (not only for the purpose of the case at bar, but in other causes on trial in this court in which it has been referred to as authority), I have found nothing to gainsay the statement that "it is conceded—it would have been impossible to deny—that the proof of petitioner's paternity is complete" (81 Cal. 435). It is true, this remark is from the dissenting opinion of the chief justice, but I find nothing in the prevailing opinion at variance with it.

Acting upon the rules of interpretation and construction laid down by the court, "the inquiry is, whether the acts and declarations of the deceased amounted to a public acknowledgment by him of this child as his own, receiving it as such

into his family, and otherwise treating it as if it were a legitimate child'' (81 Cal. 424). But in the determination of this controversy upon this trial the court must consider that the fact of paternity is denied even here, and it is the first of the questions of fact which will have to be determined in any proceeding prosecuted by petitioner for the purpose of asserting his claim to inheritance (81 Cal. 416). The counsel for the respondents (Mr. Delmas), in his closing argument, insisted that the concession he made in opening was only for the sake of argument, and not at all as the admission of a fact, and he finally claimed that the fact of paternity had not been established by legal proof, and counsel (Mr. Delmas) asserts that, if we strike out the declarations testified to by the witnesses who were not members of the decedent's family, there is absolutely no evidence to impose the paternity of petitioner upon the decedent, Gershom P. Jessup; and, further, the counsel strenuously urges that the history of the decedent shows that he was not the father of the petitioner, as do the declarations of the decedent to Bogert that he was taking care of a boy child of a friend of his; his statement to Isaac; the will, without mention of the boy. The diary of Gershom, in which he held communion with himself in the secrecy of his own chamber, makes no mention of petitioner as his child, but does describe him in another relation.

Is there a single fact in this case—asks the counsel—is there a single circumstance in this case to distinguish it from the case presented to the supreme court, and upon which that tribunal declared that there was not sufficient evidence upon which there could be founded a claim of public acknowledgment of the petitioner by the decedent, Gershom P. Jessup?

The rulings of the supreme court are imperatively binding upon this subordinate tribunal; and under that, the counsel opposing the petitioner maintains, all the acts of decedent prior to March 31, 1870, must be eliminated; but what was the necessity of counsel discussing the statute of 1850 and its inapplicability to the issue of adoption when the petitioner does not claim that the acts prior to 1870 prove more than paternity?

Those acts show simply the course of conduct and the tenor of treatment by decedent of the petitioner.

The issues, then, to be examined anew by this court are: First, the paternity of the petitioner, and, second, the alleged acknowledgment as son and heir. A new trial is a re-examination of an issue of fact in the same court, after a trial and decision by a jury or court: Code Civ. Proc., sec. 656. We are then to consider the facts as they now appear in this case, and to deduce therefrom the truth or falsity of petitioner's pretensions to the status of son and heir of the decedent.

Is the petitioner the child of decedent? No fact could be clearer in the light of evidence. We have their history most plainly traced from the beginning. The meeting of the bachelor, Gershom P. Jessup, with the girl, Josie Landis, in Marysville; the ripening of their early acquaintance into intimacy; frequent intercourse in that town; her coming to San Francisco; her being placed in the care of the nurse; the birth of the child, without a suggestion anywhere in the record of any other procreant cause. There is nowhere the shadow of an intervener in their intimacy between the begetting and the birth of the boy born at 3 Varennes place, San Francisco, on March 20, 1866.

It is established here that in 1865, when the decedent was a resident of Marysville, he met and made the acquaintance of Josie Landis, a young lady of intelligence, education and refinement, well reared, not long returned from school in a religious institution in Santa Clara county, to which she had been taken by leave of her parents, under the chaperonage of the wife of the pastor of the Methodist church in the town or village in which she had lived—Nicolaus, Sutter county. The testimony of her schoolmates is to the effect that she was amiable and accomplished. One schoolmate remembers her because she was quite musical (see testimony of Mrs. Georgianna Elizabeth Russell, page 71, Judge's MS. notes, second trial); another schoolmate witness was the daughter of the minister's wife who accompanied the young lady to school in Santa Clara (see testimony of Mrs. Mattie Deal, page 74, Judge's MS. notes), and who knew her very well in Marysville.

It was this young lady who, having contracted the acquaintanceship of the decedent, became his victim, and their intimacy having become a topic of comment in the community, the result of their intercourse being no longer doubtful, she came to San Francisco, and was here placed by her seducer, on or about the 1st of March, 1866, in the care of Mrs. Abigail Nugent, a colored woman of undoubted character and peculiar fitness for her delicate trust. In her home, on the 20th of March, 1866, the petitioner was born. The story of her daughter, the witness Mrs. Margaret E. Hatton, as given on this trial, though necessarily largely repetitive of her testimony given on the first trial, may be summarized here for comparison with the evidence intended to overcome its effect. Mrs. Hatton testifies in substance, that Gershom P. Jessup brought Miss Josie Landis, in the year 1866, to the house of her mother, who is now dead; Miss Landis remained in that house for about nine weeks, until after the birth of Richard; witness heard a conversation between her mother and Gershom Jessup about the young lady; he called to see her after the birth of the baby and inquired of mother of witness how Miss Landis felt, how she was getting along; mother replied that she was feeling bad, despondent over her situation; mother said that she thought he ought to marry her, as he was the cause of her downfall; he replied that he would do what was right by her; the child was born March 20, 1866; Miss Landis was there a week or ten days before the baby was born, and he was seven weeks old when she left. Mrs. Rachel Quinn assisted mother of witness; she was employed by her mother; after the birth of the child the father came; two gentlemen came with him; one was his brother, Isaac Jessup, and the other a Mr. McClellan; Isaac Jessup did not visit there more than once at that time; Gershom and Isaac both called together after that, once while Miss Landis was there, twice afterward; witness was at home when they called; they talked about the baby and took him and played with him; first one and then the other would take up the baby and talk to him and talk about him; Gershom would ask Isaac if he did not think the baby was a fine boy, and asked if he did

not look like him. Gershom introduced Isaac to witness as his brother; saw Miss Landis write; would know her handwriting; saw her write several times when she was at mother's house (papers produced and shown to witness); witness first saw those letters at her mother's house; her mother opened and witness read them; they were from Miss Landis, from Nicolaus, Sutter county; the envelopes were postmarked "Nicolaus," and some, witness thinks, "Stanislaus," but am not sure about that (letters introduced); those letters are in the handwriting of Miss Landis, mother of Richard; witness saw Miss Landis afterward, between 1870 and 1872; she came to house of witness in Petaluma and remained all night; she conversed about Richard; she asked witness to allow Richard to sleep with her that night; she wanted to know how Richard fared, how he was treated, clothed, and how his father acted toward him; she spoke of Gershom P. Jessup as the father; she called him "Gus"; she remained from early in the evening until next morning; the boy Richard remained with witness in Petaluma for seven or eight years; then witness brought him to San Francisco, and he resided with her mother until she died in August; then he went to Washington College, at Washington Corners, Alameda county, where witness took him at request of his father. Gershom Jessup paid for board and care of Miss Landis while she was at witness' mother's house, and he paid for Richard; he paid mother of witness $40 per month, exclusive of clothing, for Richard from the time he was born; his father always provided the best clothing, and directed that he should have the best; he didn't want the child to wear calicoes, he wanted him in white always; he once called and saw the child in a ".print," a calico dress, and he wanted mother of witness to never mind the expense, but have the child clothed in white, as he was able to pay for it; he used to caress the child and call him pet names, "daddy's child," and witness could not remember how many foolish things; Richard went with his father to Woodward's Gardens, North Beach and the Cliff House; Richard called him "papa" in the beginning, and later "father"; they went in the streetcar; witness went with them; they went quite often; there was a menagerie, monkeys and parrots, at North Beach;

"Dick" was very fond of them; his father would give him money to buy nuts and candies to feed the animals; his father used to carry the child; Richard was sick sometimes; his father always told witness to take the best care of him and to send for the doctor without delay; Dr. H. H. Toland used to attend him when the boy was sick; the child had a wet-nurse, a Mrs. Renfrew, of Petaluma, recommended by Dr. Wells of that place. Mr. Gershom P. Jessup paid her $50 per month; witness had correspondence with his father about the child; received letters from the father, but have none now—they were destroyed by witness with other papers and letters before she went east; witness made a search for letters among her effects in Napa; but only found the letters produced here written by Miss Landis; witness destroyed the letters in October, 1866, when she destroyed a number of letters and notes and papers she thought of no value; the letters produced here. were among the witness' mother's papers which witness got after her death; witness took the child to Mrs. Renfrew's, and Mr. Jessup gave witness $40 extra for her trouble in carrying the child for three months; Richard was very delicate, and his father gave instructions to always call the doctor without consulting him; witness knew the artist, S. M. Brookes, and took Richard to him at the request of the father to have the boy's picture painted; took Richard to the artist Brookes; had also the picture, ambrotype in velvet case, with lock of hair inclosed, made at the request of the father; there was only one ambrotype, the one produced in evidence; after he had the oil painting he gave it to witness back; Gershom Jessup said he named the child Richard after his brother, who died and left him what he had; and he wanted Richard to have the name of his uncle and the property, as it all started from him; Richard was christened "Richard Page Jessup" at the direction of his father, and by Rev. T. M. D. Ward, presiding elder at Petaluma; witness was present; mother of witness told Mr. Jessup about it and he gave her $5 to give to the minister, who is now a bishop, and may have been such then; witness had a son christened at the same time, Richard Henry Miller; Mr. Jessup did not want Miss Landis to see the child; he was afraid she might make him dissatisfied and want to take

him away; once Mr. Gershom Jessup called at mother's; he was very much excited, and said that Miss Josie's folks had heard about that little affair, and he was afraid one of her brothers was coming down to shoot him; when witness took the boy to Washington College, met Mr. Harmon, the principal, and he said that Mr. Jessup had made arrangements for "little Dick"; had conversations with Professor Harmon about the boy and concerning provisions for the boy's welfare, talked about his clothes, his studies, and how he was getting on; Mr. Harmon told witness not to send the boy any more money, as witness had been in the habit of sending some change, and Mr. Harmon thought it might have a tendency to make him extravagant, and his father furnished all that he needed; the boy was entered as "Richard Miller" at the direction of his father, who said he did not want his mother to know his whereabouts; Mr. and Mrs. Harmon always spoke to witness of him as "Richard"; Mr. Harmon always alluded to Mr. Gershom Jessup as Richard's father; when Richard was quite a baby his father wanted to take him east to some of his relatives, he didn't say what part of the east; when Richard had grown up his father told witness he wanted Richard to learn to work, to grow up so he would know the value of money, as he would have all that he left and he wanted him to know how to take care of it; once Mr. Jessup, about two years before he died, told witness he thought of keeping house, and he was thinking of having witness to keep house for him as she had raised Richard, and he wanted to have him with him, so that when he had his rheumatic spells he might have some one with him to look after him; witness told him she could not, as she was about to get married again; he spoke of this again not many months before he died, in March, witness thinks; he said he was tired of moving around from place to place, and he wanted to have Richard with him; Mr. Jessup told her she should address the boy as "Richard Jessup"; while she was at Petaluma letters came in her care, she gave them to Richard; she saw Richard write letters addressed to Mr. Jessup; he wrote without her assistance; he showed her the letters to see if they were correct, as he wanted the letters written to his father to be correct, to be perfect.    After

Richard was fifteen or sixteen years old his father purchased most of his clothes—sometimes made to order—some she purchased while he was at Petaluma; when Richard went to San Diego he wrote to her; she has none of those letters now, destroyed; he signed sometimes "Richard," sometimes "R. P. J."; when he came from San Diego he came right up to Napa; witness wrote to Mr. Jessup, and received a reply, but has not retained or preserved that letter; she received two letters, perhaps three; in one of them he wanted her to keep Richard in Napa; he wanted her to see after him; he wanted him to work, but not too hard; she saw his father after in San Francisco; she told him Richard had been working in a tannery; that he had got tired and wanted a rest; his father said he had seen him; Richard came back to Napa, and she told his father that he wanted a watch and he sent one to him; she sometimes supplied Richard with money and his father would refund it; Richard was restless and inclined to rove; Mr. Harmon said that Richard was a bright scholar—thought he would make a good business man; once an accident happened to Richard—he fell off a horse, and he had concussion of the brain, and he had to have a doctor. Mr. Jessup was angry when he heard of it; witness called to see Mr. Jessup often in San Francisco at various places where he had his rooms; she met a colored man who used to wait upon him, and once she saw Isaac Jessup there; she had Richard with her at those times; she remembers now an incident that occurred then about a pair of pants purchased by his father for the boy; Richard remained with his father one night on Market street, when she brought him from the college, and she went to San Rafael, and he remained over night with his father; the same day, when she came back, had lunch with his father and Richard at Swain's, on Market street; when she told Mr. Jessup she could not keep house for him he said he was sorry, and he made her a present of $40; the mother of witness was a Methodist, and attended church on Powell street, between Pacific and Jackson streets; witness thinks that her mother came to California between 1856 and 1858; she was a ladies' nurse; she worked for Colonel Smedberg, Hall McAllister, Colonel Sumner, U. S. A., Colonel Charles L. Weller, Post-

master, I. W. Raymond, S. F. Butterworth, Major P. B. Reading, George and John McMullin, and other families; when the mother of the boy came to see witness at Petaluma she told her she had been married to a Dr. Weston.

In connection and in comparison with this testimony may be considered the evidence of Isaac Jessup, surviving brother of the decedent. He says that he is now fifty-eight years old; from infancy to 1850 he was intimate with Gershom; come to California in 1850 and remained until 1854; and continued on intimate and friendly terms with him until the witness returned east; was away ten years; came back in 1864; Gershom was not married; so far as witness knew he had no child; witness knew Mrs. Abigail Nugent; she came to his rooms in 1865; witness again saw her on Union street when he was on his way to the baths at North Beach; he met her near a little street—Varennes street—and she asked him to go into her house to see a baby; the witness went in and saw a little white baby on the bed; he asked her whose child it was, and she said "you know"; witness did not know and had not the remotest idea whose it was; subsequently, however, he spoke to his brother Gershom and told him of the incident of meeting Mrs. Nugent and seeing the child, and asked him about it; he said it was not his; but a few months prior to his death Gershom was over at Isaac's house in San Rafael, and when he was leaving, on his way to the train, Isaac said to him: "Gus, whatever became of that boy you were putting up for?" To which Gershom replied that he had tried to make something out of him, but the boy was of no account and he had to let him go; the witness says he asked him this because he had been informed that Gershom was "putting up" for a boy; the witness never saw the boy except when he was a baby in Mrs. Nugent's house, and does not know that it was the same; he knew Josie Landis; first saw her in 1865, on Pine street, in the studio of a Mr. McClellan, by whom he was introduced to her; between that time and 1874 witness had not seen her until he met her in the cars at Sacramento on his trip to San Francisco; witness denied that he had ever laid eyes on the petitioner before this proceeding was begun except as he had already testified; never was with him in the cloth-

ing store of Joseph Brothers, as Harris Joseph states (Harris Joseph testified [see pages 21 and 22 of Judge's manuscript notes on this trial] that he was a merchant tailor on Montgomery street, and knew Gershom Jessup, and used to make clothes for the boy Richard; made his clothes of the best material on the order of his father Gershom; witness saw the boy at his store in company with Gershom and Isaac Jessup; Gershom Jessup and the boy generally came on Saturdays when witness was very busy; Gershom would speak of the boy as his "son" of his "boy"; the boy was fourteen or fifteen years old at the time when Isaac Jessup came; Mr. Harmon came with the boy the first time; the reason why witness did not mention on the former trial that Mr. Harmon came with the boy was that he had not been asked the question, and the same with regard to the visit of Mr. Isaac Jessup).

The witness Isaac Jessup further testified that he was certain it was in 1865, and not in 1866, that Mrs. Nugent called to see his brother; witness saw the lady in the summer of 1866; approximately it was about seven or eight months before that time that Mrs. Nugent called at his brother's room; witness thought it was before the final distribution of his brother Richard Mânet Jessup's estate that he saw the baby; he judged the boy was about four months old at that time; the first time the colored nurse called at his brother's room the witness did not ask her name; the second time she called, he inquired, and she told him "Mrs. Nugent," but witness was positive that this was not in 1866, as in the fore part of that year he was not occupying his brother's rooms; a friend of his was, and witness occupied rooms elsewhere for most of that year; when Gershom returned to town Isaac told him of her visit, that a colored lady named Mrs. Nugent called, but he said nothing; that was at 240 Montgomery street, southwest corner of Pine street; when witness met Mrs. Nugent on the street she asked him if he did not want to see a fine baby boy; he said "yes"; she requested him to go along with her, and he went into her house, and after inspecting the child he asked whose it was; she said "you know"; witness avers that he did not know, but after he had seen the baby he saw his brother at his room at the

southwest corner of Pine and Montgomery streets, the same place where the woman had previously called, according to his testimony, and told him about the colored woman and the child and the incident of meeting her and seeing the baby, and Isaac asked Gershom, "Gus, who does this baby belong to?" and he replied, "It don't belong to me." Those were the words he said, and the witness said to him, "The child looks something like you," or words to that effect, to which he made no answer but laughed it off; when witness saw Miss Landis he did not notice that she was in the family way; when he spoke to his brother Gershom in San Rafael and asked him where was the boy he was putting up for, Gershom responded that "the boy was of no account; he got tired of him and let him go"; those were the only two conversations Isaac ever had with Gershom about the boy. Gershom told him he had been taking care of him and trying to make something of him, but he was of no account and he threw him off; witness thought that Gershom said he had been educating the boy; witness was sure that he never saw that boy except as he stated in his testimony; after the decision of the case upon the first trial he had a conversation with the boy in which there was a suggestion of compromise, but witness thought the terms offered by the petitioner too small, still he thought the petitioner ought to settle and have something left, as if the litigation went on the lawyers would have all of it—a most prudent proposition, if no principle were at stake.

This testimony of Isaac Jessup is of pregnant import when compared with his testimony upon the former trial concerning his knowledge of Josie Landis and the boy, and considered in conjunction with the language of the prevailing opinion in 81 Cal. 426, 427, which it is appropriate here to quote:

"It is sufficiently shown that the mother of the child remained at the house of the nurse about seven weeks, during which the deceased called there frequently, the witness says, and Jessup paid all the expenses. After the mother left, the child was kept and cared for by the nurse, at the expense of Jessup, who called frequently to see it, and, as it got old enough to observe things, would play with it, calling it his

boy and calling himself daddy, and at a still later period would take the child and the witness—who appears at that time to have acted the part of nurse girl to the child—to North Beach and let him see the animals there, and buy nuts and cakes for it to feed to them. The girl says that he was very fond of the child, and that it was called Richard at his request. Her testimony is very full as tending to show his interest in and apparent affection for the child while it remained at the house of the original nurse and in the city of San Francisco, she saying, among other things, that he said 'he wanted to make a man of him'; and 'if Richard behaves himself and does what I want him, he will not be sorry for it,' and many other expressions of this kind. All this might have gone far toward proof of acknowledgment and adoption if it had been public and at a time when the law authorized adoption by such kind of acknowledgment. But it was never public. It was made and done only to and in the presence and hearing of the negro family, in whose care he placed and continued to keep it. When he took it out it was with the negro girl, and then not to a place where he would be likely to meet members of his own family and friends. And it all occurred during the period of the child's residence in San Francisco.''

It is here shown by the testimony on this trial of Isaac Jessup that he visited the very place for the purpose of seeing this child where the learned justice said the father, Gershom, would not have been likely to meet any member of his family.

It is plain, from his own evidence, that Isaac Jessup knew all the time that Gershom was the father of Richard and was discharging the obligations of a parent toward him; he himself has said, in so many words, that Gershom told him he had been taking care of the boy and had been educating him and been trying to make something out of him, but that he had thrown him off because he had been unable to accomplish his purpose; and this conversation occurred only a few months before the death of Gershom (see page 66, Judge's MS. notes of this trial). It seems to me that, taking the evidence of Isaac Jessup throughout on this trial, in connection with his conduct as disclosed by the record here made,

there can be no doubt that he at least believed that his brother Gershom was the father of this boy, and that this belief was fostered and fortified by the action and avowal of the decedent, even when he tried to evade the questionings of Isaac and endeavored to dismiss the subject by "laughing it off"; but it was no laughing matter, and the truth did finally come out when, with apparent chagrin, Gershom confessed candidly to Isaac, in their last interview at San Rafael, that he had discarded the boy because he was disappointed in his hopes of making a man of him; it was the expression of one brother to another, who had been persistently pursuing the subject for the purpose of eliciting a direct and unequivocal answer—a full and final answer, closing all doubt, from the father of the boy to a member of his own family, "such family as he had" (81 Cal. 434), the only surviving brother and the only member of the family resident in this section of the country.

When we place in parallel the testimony of Mrs. Hatton, the daughter of the nurse Mrs. Nugent, and that of Isaac Jessup, in this second trial, there seems to be an unconscious confirmation by the latter of the story of the former, which in itself is clear, coherent and consistent throughout; for, with all his studied evasions, Isaac Jessup has confessed to a knowledge of the boy almost from birth, and his whole course of conduct from the beginning shows his abiding conviction that the decedent was the author of the "fine white baby" whom he was induced by the colored woman to visit and examine at 3 Varennes street, when on his way to the North Beach baths; his question as to its paternity; the significant interrogative answer of the nurse, Mrs. Nugent, "*you* know"; his assumption of innocent ignorance at the time; his rumination after retiring from the abode of the nurse; his guessing and suspicion as to the paternity of the child; his pointed remark to Gershom when he said, about a month afterward when he told him of the incident, "The child looks something like you," and the latter made no reply, but laughed it off—there was no denial in that; his behavior after the death of Gershom and his destruction of papers belonging to the deceased immediately after he obtained possession of his effects (see pages 71 and 72 of

Judge's MS. notes); his interview with Richard. after the first decision of the supreme court and before the rehearing; all these circumstances, and more that may be gathered from the record, point with unerring finger to the recognition of petitioner by this sole member of such family as Gershom had upon this coast.

The letters of Miss Landis to the colored nurse, Mrs. Nugent, alluded to in the abridgment above of Mrs. Hatton's testimony, having no element of novelty in this second trial, need no further reference, except in so far as it is necessary to the connection of the circumstances constituting the chain of this new case.

In regard to the declarations of decedent with respect to his relation to the petitioner, it seems that under the code evidence was admissible to show that he was the father of the boy (subdivision 4 of section 1870 of the Code of Civil Procedure), and these declarations are abundant to establish that fact.

It seems to me that the issue of paternity is strictly and plenarily established as alleged by petitioner, and that every requirement of the rules of evidence in that behalf has been fully complied with.

Having disposed of the issue of paternity in favor of the petitioner, we have to consider the remaining question of recognition and acknowledgment. Petitioner claims under section 230, Civil Code, which requires the institution of heir or adoption to be made by the father. It must be the father. The institution of heir is the primary object of the statute. The succession of property rights is incidental; it is a status that is involved; it is the relation of the child to society.

In the opinion of this court three of the elements of the statute, section 230, Civil Code, have been established: 1. There was an illegitimate child; 2. The petitioner was that child; 3. Gershom P. Jessup, the decedent, was the father of that child. We are now to consider the question, Was the petitioner publicly acknowledged by Gershom P. Jessup?

What satisfies the statute upon this issue? This is answered in In re Jessup, 81 Cal. 457, in the opinion of Mr. Justice Works, in stating the doctrine applicable to such

a case; and I do not interpret the later decision in the same estate as announcing a discordant principle (81 Cal. 413).

Is the evidence produced on the part of petitioner sufficient to show that the decedent, Gershom P. Jessup, "publicly acknowledged" him?

To establish his right a claimant must prove two things: 1. That he is the illegitimate child of the alleged father; 2. That he has been openly and publicly acknowledged, and received and treated as such. But in order to avoid imposition and fraud, the statute requires that these things shall be established by certain proof. Under the statute of 1870, it must be proof of his "treating, receiving or (and) acknowledging him publicly as his own legitimate child." That is to say, he must treat, receive or (and) acknowledge him as if he were his own legitimate child; and in order that the proof may be made by disinterested parties, and fraud and imposition avoided, all of these must be done openly and publicly, and not secretly.

Section 230 of the Civil Code, although differently worded, is in effect the same. The language is, "by publicly acknowledging it as his own, receiving it as such into his family, and otherwise treating it as if it were a legitimate child."

Undoubtedly the most satisfactory way of establishing the necessary facts is by proof that the claimant has been received into the family, and given the family name.

But this is not necessary where there is sufficient proof of a reason for not having done either: In re Jessup, 81 Cal. 434.

Mr. Justice Fox said, in the finally prevailing opinion in the case cited: "It is said that as Jessup was never married, he was not bound to receive this child into his family, for he had none in which to receive it. But we do not so read the law. The language is, 'publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child.' If he has a wife, he can only receive it into the family with her consent; but if he has no wife, he must still receive it into his family; that is to say, in such family as he has, the child must be acknowledged

and treated as his—at least, he must not deny to the members of such family that it is his'': In re Jessup, 81 Cal. 434.

The oral declarations made by decedent to various witnesses are numerous and continuous through a course of years down to a very short time before his death.

I have considered the declarations as to paternity by themselves alone, as near as might be, and separate and segregated from the declarations of acknowledgment when treating of the first issue tendered by petitioner, but necessarily much of the evidence in favor of public acknowledgment is inseparable from that of paternity.

As to acts of public acknowledgment, it is important to keep in mind certain dates, as the rule of construction is, according to the decision of the supreme court, different under the code, section 230, which went into effect January 1, 1873, from what it was under the statute of 1870, and here it seems, in order that there may be no misprision in interpreting the opinion of the supreme court as rendered by Mr. Justice Fox, that its terms should be quoted (81 Cal. 419-425):

''All the rights which are given to the petitioner in the premises are given by statute, passed in derogation of the common law. It is claimed by the respondent that in determining those rights the rule established in section 4 of the Code of Civil Procedure is to be applied, and the statutes are to be liberally construed with a view to effect the object and to promote justice. That is true, so far as it applies to the provisions of the code, when applied to the acts of the deceased done since the passage of the codes. But the converse of the proposition is the rule, so far as reliance is placed upon the statutes passed prior to the codes and acts done under them: Pina v. Peck, 31 Cal. 359. And even as to the code, 'liberal construction' does not mean enlargement or restriction of a plain provision of a written law. If a provision of the code is plain and unambiguous, it is the duty of the court to enforce it as it is written. If it is ambiguous or doubtful, or susceptible of different constructions or interpretations, then such liberality of construction is to be indulged in as, within the fair interpretation of its language, will effect its apparent object and promote justice.

"The law in force at the time of the birth of the respondent reads as follows: 'Every illegitimate child shall be considered as an heir of the person who shall, in writing, signed in the presence of a ·competent witness, have acknowledged himself to be the father of such child': Stats. 1850, p. 220, sec. 2. This statute must be strictly construed: Pina v. Peck, 31 Cal. 359. There is no pretense that any such written acknowledgment was ever made. It follows that under the statute neither oral admission nor proof (otherwise than by such written acknowledgment) of the fact of paternity will constitute the illegitimate child an heir.

"This statute continued in force until March 31, 1870, when it was repealed, and the legislature passed 'An act providing for the adoption of minors and the legitimizing of children born out of wedlock': Stats. 1869-70, p. 530. The third section of this act provides, among other things, that an illegitimate child cannot be adopted without the consent of the mother, and that the consent of the minor, if over twelve years of age, shall always be necessary. If this section is construed to apply to the adoption provided for in section 9 of the same act, it requires things which there has been no attempt to prove in this case, but we think that it cannot be fairly construed to have any application to adoptions under said section 9. The first seven sections of the act provide for the adoption of children by strangers, and, while the language of section 3 referred to seems to be general, we think it was intended to be limited to the cases provided for in that part of the act embraced in the first seven sections. Sections 8 and 9 read as follows:

" 'Section 8. A child born before wedlock shall, to all intents and purposes, become legitimate by the subsequent marriage of its parents.

" 'Section 9. Either or both parents of an illegitimate child, or the father with the consent of his wife, or the mother with the consent of her husband, may acknowledge such child as his or their own by a document in writing, executed by either if single, or both if married, or by treating, receiving, or by acknowledging him publicly as his or their own legitimate child; and such child, and the one mentioned in the foregoing section, shall, to all intents and

purposes, be deemed legitimate from the time of its birth, and entitled to all the rights and privileges of legitimate offsprings.'

"This statute must also be strictly construed, for it was not until the adoption of the codes, and is only as to the codes, that the rule that statutes in derogation of the common law must be strictly construed, was changed. This was the first statute which authorized legitimizing of an illegitimate child by any mode other than the written acknowledgment provided for in the statute of 1850, and at the time of the adoption of this statute the respondent in this case was a little over four years of age.

"This statute remained in force until January 1, 1873, when section 230 of the Civil Code took its place. That section, so far as it relates to the legitimizing of an illegitimate child, provides: 'The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth.'

"This provision, being a part of the code, is to be liberally construed, but it is not retroactive, and relates only to minor children (Estate of Pico, 52 Cal. 84, 56 Cal. 413). Section 1387 of the same code is a part of the chapter on succession, and provides: 'Every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child, and in all cases is an heir of his mother, and inherits his or her estate in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock.' It is contended that this provision of section 1387 is a limitation upon section 230, but we do not think that the code should be so construed. The whole chapter on adoptions relates to the adoption of minors; and by the express provision of this section 230 an illegitimate minor, acknowledged and adopted as therein provided, 'is deemed to be legitimate for all purposes.' One of the objects of adoption, and of legitimizing by adoption, is to give the capacity ·

of inheritance. It has been already determined in the Estate of Pico, 52 Cal. 84, 56 Cal. 413, that this section relates only to minors, who alone are subjects of adoption, and that section 1387 provides for giving to illegitimate adults the capacity of inheritance.

"It follows from these statutes, and the rules of law applicable to the construction thereof, that prior to 1870, when this respondent was four years of age, he (the respondent) could not have been adopted by the deceased, or given the capacity of inheritance from him, except by acknowledgment in writing in the presence of a competent witness; that from March 31, 1870, to January 1, 1873, he could have been so adopted and given such capacity either by acknowledgment in writing as before, or by the deceased having 'treated, received or acknowledged him publicly as his own legitimate child.' Both these statutes must be strictly construed: Pina v. Peck, 31 Cal. 359. It is conceded there was no written acknowledgment, such as prescribed by either statute. The act of 1870 cannot be construed as retroactive, so as to give force or effect to acts done or performed before its passage, which they would not have had at the time they were so done or performed. Since the 1st of January, 1873, he could have been so adopted and given such capacity of inheritance by the deceased having 'publicly acknowledged him as his own, receiving him as such . . . . into his family, and otherwise treating him as if he were a legitimate child'; and this provision is to be liberally construed. But liberal construction does not mean that even this provision is to be construed to be retroactive. Nothing that was said or done by the deceased prior to January 1, 1873, can be construed as proving, or tending to prove, such adoption, unless it had that effect at the time it was said or done, and under the law then in force.

"Liberal construction does not require or authorize the frittering away of the written law. Nor are we authorized to consider the apparent justice or hardship of particular cases, for we are not appointed to decide cases alone, but to settle principles first; and, second, to decide cases according to those settled principles as applied to the facts presented in the cases. The decision of a single case according to its apparent justice or hardship might establish a principle that

would cause greater injustice or greater hardship in numerous other cases. While it is true that illegitimate children are themselves innocent of wrong, and for that reason are entitled to the sympathies of mankind and to such reparation as the laws can give, it is equally true that courts ought not, by any extraordinary liberality in the construction of those laws, to enable wantons in silk, having children without names to prey upon the estates of dead men, however much they may have thrived through the fears of living ones. While in this particular case no adventuress is seeking to recoup for her own wrong, it is important to see that a rule of law is not established by construction, which would place a premium upon perjury in other cases, though none may be manifest here. Of the women who are mothers of nameless children, there are few indeed who would hesitate at any fraud, or to whom perjury would seem a crime, if by means of it a dead father who had left a goodly estate could be secured for the nameless one, and this even while continuing in illicit intercourse with the actual father still living. And human nature is so weak that even men are not wanting who would aid their mistresses in palming off their own children upon the estates of dead men, if thereby a competence could be secured upon which both, with their illegitimate offspring, could continue to live in luxury and in crime. On the other hand, the court ought never, by a strained construction in the other direction, to relieve a licentious man or his estate of any of the obligations or burdens which the legislature has imposed as a restraint upon vice, as a reparation to those who actually suffer from his vices, or as a protection to the commonwealth from the burden of supporting the nameless offspring of his crimes. Between these two dangers, the duty of the court is fairly to interpret the laws as the legislature has framed them, without regard to how its action may affect individual cases. If thus interpreted they are found to be too stringent or too liberal, the remedy is through the legislature, and not the courts.

"Acting upon these rules of interpretation and construction, the inquiry is, whether the acts and declarations of the deceased amounted to a public acknowledgment by him of

this child as his own, receiving it as such into his family and otherwise treating it as if it were a legitimate child.

"As he had no home and no family, in the strict sense of 'a collective body of persons who live in one house and under one head or manager—a household including parents, children and servants,' it would not be a fair or liberal construction to say that the child had not been adopted or acknowledged because he had not been received in such a home or made a member of such a family. On the other hand, since it is a fact that the deceased did have a family in the sense of having 'brothers and sisters, kindred, descendants of one common progenitor,' with some of whom he was brought into frequent contact, and also business associates and friends with whom he was in daily intercourse, from all of whom he not only studiously concealed, and to his brother in express terms denied, the relationship, it would require a liberality of construction destructive of the language of the statute itself to hold that there had been an adoption within the meaning of the code, or of the statute of 1870. And it is conceded that there was none under the statute of 1850.

"An analogous question was recently considered by this court at great length in the case of Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131, and the sum of conclusion there reached was that the parties must have held themselves out to their relatives, friends, acquaintances and the world as occupying toward each other the relations claimed for them in the action. Speaking generally, the laws applicable to this case seem to require something like the same kind of public acknowledgment and recognition as was required in that case. Was there such acknowledgment and recognition?"

Some of the remarks on page 423 of the above-quoted report are admittedly irrelevant and obviously inapplicable to the record of this cause, for the unfortunate mother of petitioner, as her letters and her life attest, was neither wanton nor wicked, apart from the connection with Gershom P. Jessup, which resulted in the birth of this boy. Otherwise, the character of Josie Landis is clean and clear, and her contrition for this single lapse is manifest in all her correspondence, conversation and conduct. Her letters prove that she was the victim of a broken and contrite heart, and that her

life was saddened and shortened by remorse for her solitary error. And only in relation to this particular portion of the opinion quoted from does it seem essential to recur to the subject of her correspondence, for that part of the opinion suggests the question: What was the solution of the issue tendered by these letters—the object of maternal solicitude, the poor little child begotten of her sin and shame by the decedent? The father, Gershom P. Jessup, solved the problem by assuming the obligations of a parent toward the child; but all this conduct, says Mr. Justice Fox, did not amount to anything; it would have gone far if at the time there had been any such statute as that of 1870, or the Civil Code, section 230 (81 Cal. 427).

It is fair to assume that if the record, as now made in this second trial, were before the learned justice, the terms of his opinion would be materially modified. If the facts, as now disclosed, of Isaac Jessup's knowledge and recognition of the petitioner were before him, it is not improper to presume that the learned justice would have found that the decedent had in a sense (and in the sense indicated by the prevailing opinion of the supreme court) publicly acknowledged his paternity of the petitioner.

In this opinion I do not choose to review the evidence reproduced from the former trial; it is enough simply to allude to it as a part of the entire case, concerning which there is no need to reiterate views already expressed. I have been endeavoring to keep within the lines of the last opinion of the supreme court, and to deal with the additional elements of evidence which, it is claimed, make a new and sufficient case conforming to the principles settled by the appellate tribunal, which principles must be applied to the facts presented (81 Cal. 423).

The new and pregnant matter in Isaac Jessup's evidence has been already treated as establishing knowledge and recognition by a member of the family and acknowledgment by the decedent; it shows that Gershom had done, up to the time he "threw the boy off," at least, "what every honest and humane man should be not only willing but eager to do." Isaac says plainly that only a short time before his brother's death Gershom said that he had been taking care of the boy

and had been trying to make something out of him and had been educating him. What stronger acknowledgment could possibly be made, in view of the fact of paternity, which it was impossible then to deny? In view of their mutual understanding and knowledge that Gershom was the father, what more could be asked as a recognition of obligation discharged to a certain extent? "Gus, whatever became of that boy that you were putting up for?" What boy was here in question except the boy begotten of the body of Josie Landis by Gershom Jessup? The very boy that Isaac told Gershom, in their rooms, after the incident of the visit to Mrs. Nugent's house, looked like him, when the father made no answer, but "laughed it off." Was that a denial? Did not his silence then and his manner and conduct subsequently signify assent? It certainly did to Isaac, as his continual recurrence to the subject matter and his continuous course of conduct establish. How could Gershom have "thrown off" the boy if he had assumed no relation or contracted no obligation toward him? And, if he had done so, his throwing the boy off, because of his waywardness or worthlessness, neither altered the relation nor diminished the obligation.

According to Isaac's testimony alone, in this trial, the petitioner has a sure footing as the son and heir of his deceased brother Gershom, for it appears therefrom that he had not only acknowledged the child, but he had given him support and education until he proved intractable, thus partially, at least, discharging the duties of a parent: Civ. Code, sec. 196.

The testimony of Mrs. Marietta Ransome, a new witness, for petitioner, is important to consider.

Counsel for respondent claims that there are only three new points in her evidence: First—that Isaac knew all about the matter; second—that Isaac met Miss Josie Landis at the train and accompanied her to San Francisco; third—that Gershom admitted that he had always publicly acknowledged Richard and treated and maintained him as his own son; and counsel (Mr. Delmas) asks: "Can the acts which the code requires to be performed be all established by a simple statement of the father that he has performed them? Can you supply a proof of the fact by a mere acknowledgment or a declaration

by a party that he has done those acts which the statute has prescribed as necessary to create the status?"

These questions find their answer in the language of the statutes of the state, which are the criterion for this court, rather than cases decided when and where no such statute existed; and such declarations have been heretofore, in this and other important cases, received without objection. The provision of the Code of Civil Procedure, section 1870, subdivision 4, does not strike me as a re-enactment of the common law as it was existent at the time of the cases cited by counsel; at all events, it has not been so construed in this state, if I apprehend correctly the authorities.

Mrs. Marietta Ransome is an entirely disinterested and manifestly truthful witness. She testifies to the statements made by Mrs. Weston (formerly Miss Josie Landis) to her in Sacramento City while she was boarding in the house of witness during the years 1878 and 1879, and to the visits there of the decedent Gershom, and his declarations as to the paternity of the petitioner, and his having always cared for and acknowledged and never denied him as his child; but the counsel (Mr. Delmas) for respondent says that, conceding that this witness appears before the court in the most favorable attitude, her testimony is of the very weakest kind, and only cumulative in its character; the danger of this kind of testimony, says the counsel (Mr. Delmas), is that by lapse of memory, interest in the case, or by sympathy that warps the memory, the witness may misinterpret the words she attempts to reproduce; thus it is that this aged witness, after so many years have elapsed, undertakes to give the very language of the statute, the declaration made by the decedent, Gershom P. Jessup; and counsel (Mr. Delmas) asks the court to mark the time when this evidence comes forward, at the eleventh hour, after the last decision of the supreme court, in the urgency of the case, to supply the connecting link in the chain of evidence; and the counsel (Mr. Delmas) requests the court to consider that this important item of evidence was not given on the first day of her testimony (September 29, 1890), but only after nearly twenty-four hours subsequent to the adjournment on that day. Mrs. Ransome was on the witness-stand three days, and, considering the strictures of

counsel upon her testimony, it may be well in this place to insert an abstract thereof:

"Three years resident of Los Angeles; married since three years to Mr. Ransome; formerly the wife of J. T. Landrum, once a judge of Shasta county; lived in Sacramento county for twenty years till I moved to Los Angeles; knew a lady named Mrs. Dr. Weston in Sacramento; she boarded with me for about two years there; knew she was Josie Landis; had conversation with her concerning her family; she told me she had a boy, whose name was Richard; she said the father was Mr. Jessup; my husband died the same year that Mrs. Weston came to live with me, about thirteen years ago, between 1878 and 1879; I used to find her weeping; she was a very sad lady; one evening I found her weeping and walking the floor in her room, and I asked her what was the matter, and she walked to the bureau and showed me a picture and said, 'That is the cause of my trouble—that is my child by a Mr. Jessup'; she said they would have been married except for the interference of her father and mother; she said the child was being cared for by the father; had other conversations with her once about Mr. Jessup calling to see her; she told me that he would be there that morning and that he was the father of her child; he called; she introduced me to him as 'Mr. Jessup'; they went to her room and were there about an hour; she called me and said she wanted me to come in, and Mr. Jessup said, 'This is the mother of the boy that I have'; he said that the object of his calling me was for me to be a witness to what he would say to Mrs. Weston in regard to Richard; it was to the effect that in the event that he should marry and have children 'Dick' should share his property with them, and if he should have no children 'Dick' should be the sole heir, and, furthermore, he said he intended to take Dick to Europe to educate him; before this Mr. Jessup had asked me as to Mrs. Weston's health, and I told him she had been in delicate health and that Dr. G. G. Tyrrell was attending her; he told her that he would care for the boy, in reply to her questions; he said he thought it was not best that she should see the boy until he arrived at years of discretion, and she replied that she must be satisfied; he said that the boy was in boarding-school, but he did not say where; he said he

had always taken care of the boy, and she replied: 'I am satisfied with the care you have given the child'; Mr. Jessup told me at that time that she was in boarding-school and that he took her from there to the colored lady, where she was confined, and that her people knew nothing of it; he said he would care for her and that her people should know nothing of her; he said that his brother knew all about it; I said, 'Why did you give the boy that name—"Dick"?' I said it was a horrid name; he said the name was for his brother; he said, 'I have a brother in New York'; I was in the room about three hours; we were engaged in general conversation, in the course of which Mr. Jessup said that the boy had been living with a colored family, but was then at school or college; she said that she thought it was hard that she had not seen or could not see the boy; Mrs. Weston was with me over a year; after that she went from my house to Mrs. Henderson's, her niece; from there she went to her grave; she was never at San Francisco after she left my house; she was an invalid; I was with her in her last moments; she said, 'I will die very soon—I have only an hour; when I am gone, write to Mr. Jessup at the Palace Hotel that I am dead, and ask him to always care for Dick, for I know he will'; she gave me no other directions, only to write to Mr. Jessup; she died in about two hours; when she had the conversation with Mr. Jessup she was an invalid in very delicate health, only able to go to her meals; I had many boarders there, over one hundred boarders after my husband's death, on Third street, between L and M streets—the Landrum House; I was not a witness in the last trial—I was then in Los Angeles; I am sixty-two years old, born in Oswego county, New York State; Mr. Jessup said he had always treated the boy well and acknowledged him as his child, and told to the world that he was his child; this was at my house on the occasion already described; I heard from Mrs. Weston after she left my house, when she was on M street, at her niece's; also from San Francisco; at the conversation alluded to, Mr. Jessup said that his brother Ike had met her at the train when she came from San Jose; he said that his brother died on the way to New York, and that the child was named after the brother who died; I keep house in Los Angeles for my husband; he is a

searcher of records; married him three years ago; was married to first husband in 1860, in San Francisco; he was then county judge of Shasta; he continued in that office six years, when we moved to Sacramento; he practiced there a little, but his health was feeble, and I kept boarders until three years ago; first husband died about nine or ten years ago; he was dead when Mrs. Weston came to my house; I had not known her before; she was in the house about a year when the conversation occurred as stated; my husband had been dead over a year; I had thirty rooms and they were always filled; the conversation was between 9 and 10 in the evening; we made it a practice to go to each other's rooms before retiring, she to mine or I to hers; witness repeats the conversation as already narrated; I was surprised when she said that the picture was that of her child, because I understood that she had no child by Dr. Weston; it was a natural subject of conversation between women; she said the father had acknowledged the child and always cared for him; the picture was that of a boy about six years old in a kilt suit; the conversation lasted about an hour; I have related the whole of the conversation as well as I can from memory; we had another conversation on the same subject; and it was a common subject between us every evening; we talked frequently on that topic for something like a year, and it was very much the same all the time; I have stated all the conversation that took place with Mrs. Weston the first night she spoke about her child; the next morning she spoke again to the same effect; it was a common occurrence for us when we were alone to talk on that subject; I could not tell all the conversation that passed between us; my husband died the year of the 'high water' in Sacramento, which was 1879 or 1880, the same year that my present husband's father died; it was about a year and four or five months after Mrs. Weston came to my house before Mr. Jessup called; he was an absolute stranger to me; I had never seen him before; I only knew of him through Mrs. Weston; she told me the night before that he was at the Palace Hotel and had sent a telegram that he was coming up there; she told me either before or soon after Jessup's visit that he had had a brother whose name was Richard, who died on his way to New York; it was before he came that she told

me this, and that the boy was named for this brother; she told me also that Mr. Jessup was a rich man, and that he had a brother 'Ike,' who lived down here somewhere and who had met her on the ferry-boat when she came to San Francisco and went with her; this she told me a month or so before Mr. Jessup's visit to my house; she said that brother 'Ike' knew all about the affair, and that he had been a good friend to them and had helped them to keep the affair quiet from her people; she told me herself that she had been Josie Landis; in the conversation when he had been introduced to me by her he said that he had a brother Richard who died on the way to New York; it was about 10 o'clock when Mr. Jessup went into the room, and was about an hour when I was summoned to the room—that was between 11 and 12 o'clock; I was there about three hours; did not go to lunch; the lunch hour was 12 o'clock in my house, but on this occasion I did not go into the lunch-room. I asked them to have lunch, but they did not nor did I. Mr. Jessup left about 3 o'clock, came back about 5 and remained until 7 o'clock; our dinner hour was at 5. I was in and out of the room the second time; while he was in the room—Mrs. Weston's room—the first time, after awhile he removed his shoes and put on his slippers, excusing himself because of his feet hurting him; he seemed to be lame and not appearing well. I first heard of this case when I saw in a newspaper an account of the supreme court decision against the boy, and I said to my husband that I knew all about the case, and he wrote to the clerk of the court that he wanted the names of the attorneys, and so came about communication with them. Three years ago I was in Los Angeles, but saw nothing in the papers about the case; I did not learn from her what was her financial condition; she did not tell me about her courtship with Dr. Weston, nor how she met him; she told me that she had told the doctor that she had the child; she did not tell me that she told him who the father was; she told me that the doctor knew she had the child; I asked her no further question on that subject; she told me in our conversation; I could not remember at which conversation; she did not tell me of having any other suitor; she did not say in so many words that she was or had been engaged to Mr. Jessup, but she would have

married him if her parents had not interfered; she told me that she had corresponded with the nurse, but did not tell me her name; said they were colored people; she never told me anything about her having any lawsuit, litigation or claim against Jessup. I first heard of the death of Mr. Jessup when I read of the proceedings of the court against the boy, about three or four months ago; Mrs. Weston had no visitors, none except those in the house; Mrs. Henderson, her niece, came to see her; Stephen M. White, lawyer, of Los Angeles, informed me that I was wanted here in court and I came; he furnished me with means to come here; I came voluntarily without subpoena.''

Taking this testimony as a whole, there is no reason why the court should subscribe to the censure bestowed upon it by the counsel for the respondent; on the contrary, it seems to me to bear the impress of truth and to be in itself consistent. Although the witness came at the ''eleventh hour'' and in the nick of time, sufficient reason is given in her testimony for not having come forward before.

It is impossible to refuse credence to this old lady's evidence; she is without motive to invent or exaggerate the facts related, and an impartial study of her statements in their integrity enforce acceptance of her narrative.

Counsel (Mr. Delmas) contends that the testimony of Harris Joseph (the substance of which is incorporated in parentheses in the abstract hereinbefore made in this opinion) should be rejected by the court as intrinsically incredible, utterly untrustworthy, as to the new matter concerning the alleged visit of Isaac Jessup with the boy to his store. But I am at a loss to understand upon what basis such rejection should be made, for the witness is a man of credit and character unimpeached, and wherein his story is inherently improbable is to my sight imperceptible; even if this were true, however, says counsel (Mr. Delmas), it would not be evidence of public acknowledgment, while it might tend to prove reception into family under the decision of the supreme court. It seems to me that under the law, as laid down for the guidance of this court, it tends to prove both. It was an acknowledgment and it was in public, and it was in the pres-

ence of and a recognition by a member of the family of decedent.

The testimony of Gustave Videau, while admitted to be new, is claimed to be only cumulative; in this claim I cannot agree with counsel, nor am I able to accept as applied to this issue his notion of what constitutes cumulative evidence. This is additional and corroborative evidence, and, to the end that the testimony itself may afford the basis for a conclusion as to its character, it may be epitomized in this place.

Gustave Videau testified that he was born at Marysville, California, in 1856, lived in San Francisco since 1867, worked for F. Chevalier in 1880, afterward for ex-Mayor William Alvord, one of the Police Commissioners, in the rolling-mills, thence on the police force from 1882 to 1888, six years; was at Santa Clara College from 1868 to 1875, then to Heald's Business College and to business; from 1884 to 1885 witness' police patrol was from First to Fourth streets, Stockton to Taylor and Sixth streets; knew Gershom P. Jessup; first saw him in Marysville, afterward in San Francisco; first at the house of witness' mother; then on California and Sansome streets; then on Market street, and on several other streets; usually spoke to him; the father of witness kept the Barnum restaurant, French restaurant, in Marysville, where Jessup used to eat; Jessup was in the habit of calling witness "Gustave"; father of witness died in 1873; witness met the young man Richard on Market street, the first time with Mr. Jessup in about the year 1885; his father introduced witness to Richard and said: "This is my son Richard"; it was between 8 and 9 o'clock at night; witness saw them together afterward on Market street maybe ten or eleven times; witness saw Gershom Jessup walking with a cane; he walked as if lame, sometimes with his left hand on his hip; sometimes Richard had his arm in his father's; Gershom Jessup told witness once that he had Richard at school. It was in the summer of 1882 that witness saw Gershom Jessup on the corner of California and Sansome streets; on cross-examination witness said he did not recollect that Gershom Jessup ever mentioned any name in connection with the boy, Christian or surname.

It seems to me that this testimony is more than merely cumulative; it adds something new to the case; it is a public acknowledgment; it presents father and son arm in arm, "in the public ways." In sight of men and women he took this child, and by his conduct proclaimed his paternity and published his acknowledgment.

The testimony of John C. Flood disposes of the evidence of Dr. Marc Levingston with reference to the statement of the petitioner, taken down in shorthand and typewritten. I do not attach much importance to this circumstance in any event; but, whatever importance it might have, it is significant that, although the tenor of the testimony was known at the first trial, Dr. Levingston was not produced as a witness for respondents.

A suggestion from this testimony is that there was a design to obtain control of the person of petitioner, based upon the belief in the purity of his pretensions to progenity from Gershom Jessup. I think this is fairly inferable from the testimony of Mrs. Nancy Maria Greeney and Mrs. Etta Koppel, and the letters said to have been written by the latter or at her instance to San Rafael.

It is contended that the court has no jurisdiction to entertain this petition, because the petitioner did not come in under section 1307, Civil Code.

This point was made also in the supreme court, and was answered in the first opinion quite summarily by Mr. Justice Works (81 Cal. 458), and in the second and prevailing opinion it did not receive any attention at all.

It is urged strenuously by counsel for respondent that petitioner should have testified in his own behalf on his trial, and that it is irresistibly inferable from his reticence that he could not contradict the witnesses produced against him, and that there is no excuse reconcilable with the validity of his claim for his refraining from testifying; counsel (Mr. Delmas) says that the petitioner has deliberately sealed up the most authentic source of information on the point of paternity—his own lips—and no other motive can be ascribed to his silence, save an inability to contradict the witnesses against him or to corroborate those in his favor. In answer to this, counsel for petitioner (Mr. Barnes) has said with force that he ad-

vised this course from the fear he possessed of the kind of adversaries with which the petitioner had to contend, such as the detective who forged a letter to entrap the witness Winter. This detective is he who confessed that the whole matter of his representation to Winter was a figment of his imagination, and that he was guilty of deception, forgery and fraud for the purpose of ensnaring that witness (see page 73, judge's manuscript notes). The counsel (Mr. Barnes) says that it was because they had such instruments to oppose them—kidnapers and forgers and desperate detective agencies—the counsel for petitioner had to fear for a poor and friendless youth confronted by power and wealth. This is his answer to counsel for respondent, and whether it be sufficient an examination of the entire record will show. Certainly his counsel had a right to apprehend harm to him in such circumstances, and had reason to rely on the strong case made in his favor by uninterested evidence. In my judgment the claim of the petitioner is now made out on both issues, and according to the law of the case, as established by the appellate tribunal.

For a Discussion of the Questions Involved in the Principal Case, see 1 Ross on Probate Law and Practice, 164-169.